### AFFIDAVIT OF SPECIAL AGENT CRAIG R. HARVEY IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Craig R. Harvey, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since July 2018.   The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston.   My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.   I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses.   Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations.   My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.      The information contained in this affidavit is based on my personal observations and review of records and reports and phone extractions, my training and experience, and information obtained from other FBI and ATF agents, Massachusetts State Police ("MSP") Troopers, officers from Maine Law Enforcement agencies including the Maine Drug Enforcement Agency ("MDEA"), local police officers, and witnesses.   The dates and times in this affidavit are approximate.   This affidavit is submitted for the purpose of the determination of probable cause for the issuance of the requested search warrants and does not set forth all of the information and evidence developed over the course of the investigation.

3.     I make this affidavit in support of two applications for search warrants in connection with

an ongoing investigation of members of the Tiny Rascal Gang and associates of Tiny Rascal Gang

members, including MIGUEL MINIER, ELYJAH ODNEY, CHRISTINA BERNBAUM,

ARMANI MINIER-TEJADA, JUAN HERRERA, JAIIR COLEMAN, KLEIN ULYSSE, DAVID

OTH, and others, in relation to violations of 18 U.S.C. §§ 922 and 924 (relating to firearms

offenses), 18 U.S.C. §§ 1959 and 1962 (relating to racketeering activity and violent crimes in aid

of racketeering), and 21 U.S.C. §§ 841 and 846 (relating to drug offenses and conspiracy)

(collectively, the "TARGET OFFENSES").

4.     This affidavit is being submitted in support of an application for two warrants to search

premises (collectively the "TARGET LOCATIONS"):

   a.     The premises of 20 Sixth Street, Bangor, Maine (hereinafter "TARGET
          LOCATION 1"), described in greater detail in Attachment A-1.  There is probable
          cause to believe that TARGET LOCATION 1 contains evidence, fruits, and
          instrumentalities of violations of the TARGET OFFENSES, as further described
          in Attachment B.

   b.     The premises of 4 Birch Heights Drive, Trenton, Maine (hereinafter "TARGET
          LOCATION 2"), described in greater detail in Attachment A-2. There is probable
          cause to believe that TARGET LOCATION 2 contains evidence, fruits, and
          instrumentalities of violations of the TARGET OFFENSES, as further described
          in Attachment B.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that the

TARGET OFFENSES have been committed, are being committed, will be committed, or are being

aided and abetted by Miguel MINIER, Jaiir COLEMAN, Armani Minier-TEJADA, Christina

BERNBAUM, Juan HERRERA, Klein ULYSSE, David OTH, and other members, associates of

members, and individuals affiliated with or aligned with the Tiny Rascals Gang, also known as

TRG.  Additionally, this investigation has led to the identification of Maine drug distributors who

receive and distribute controlled substances provided by TRG, including Shelby KLEFFMAN, a

resident of TARGET LOCATION 2.

# BACKGROUND

6.     Over the past nine months, the FBI Task Force has been investigating the criminal enterprise and street gang known as Tiny Rascals Gang or TRG. Based on my work on the TRG investigation and my conversations with other agents who have worked on the case, I know that the FBI Task Force has identified numerous TRG members who were and are involved in acts of violence, acts involving the possession and use of firearms, and acts involving drug trafficking in the District of Massachusetts, the District of Maine, and elsewhere. The acts of violence under investigation include one or more incidents of murder and attempted murder committed by TRG members, as well as multiple shootings committed by TRG members in Massachusetts. [1]

7.     The FBI Task Force's investigation into TRG has confirmed that TRG is a continuing criminal enterprise operating in Massachusetts and multiple other states across the country. The ongoing investigation has also revealed discussions among TRG members regarding the structure of TRG in Massachusetts, the gang's relationships and rivalries with other local gangs in Massachusetts, and the relationships between TRG cliques or local groups in Massachusetts and TRG groups operating elsewhere in the United States. For example, the FBI Task Force has obtained information about TRG's rivalries with members of the Eastville/MP45 gang, the Trinatarios gang, and the Bloods gang, all violent criminal organizations themselves. Based upon my review of reports and other information provided by confidential informants, it appears that the Maplewood gang from Malden, Massachusetts is aligned with TRG and that the members of these and other various gangs frequently cross over and associate with one another in furtherance

---

[1]     Among other things, I am aware that members of TRG have been charged with committing a murder in Lynn, Massachusetts on or about July 4, 2020. I am also aware of multiple specific shootings under investigation by state authorities involving TRG members including a December 2020 homicide in Lynn, Massachusetts.

of profits from the trafficking of controlled substances and/or mutual protection of those drug enterprises against rival gang members. The investigation has confirmed that TRG members have established a lucrative drug distribution network in Maine that they continue to operate despite overt federal law enforcement activity.

8.     I know through this investigation, review of cellular phones, and debriefs of multiple sources of information (including CW-1 and CI-2) that the Maine drug operation run by TEJADA and HERRERA and BERNBAUM involves the delivery of large quantities of controlled substances to specific drug contacts in Maine, oftentimes on consignment (i.e., the drugs are fronted with payment to be made later). The drug contact will order specific types and quantities based on the perceived demand of their customer base. The delivery of the controlled substances takes place a short time after the controlled substances are received, and will often take place either at an AirBnb location rented by the TRG member, or at a mutually agreed-upon delivery location. The AirBnB location serves as a base of sorts for the TRG presence in Maine; they sleep in the location and store firearms, cash, and controlled substances in the premises during the time of the rental. Once the Maine drug contact has the controlled substances, they then conduct their own manufacturing and adulteration of the controlled substances and distribute it to their customers in Maine, and collect outstanding money owed. Once the sales of the controlled substances are complete, a meet is arranged where the cash is provided by the Maine drug contact and further deliveries are arranged or conducted, and the process continues. Through this arrangement, the TRG member distributes the drugs to a small selected group of individuals and does not distribute on a retail level. They also offload most of the work to the Maine drug contact and simply arrange for delivery of controlled substances or retrieval of cash.

9.      The search warrant applications being sought through this affidavit seek to search two locations, as follows:

      a.      the premises of an AirBnB rental location currently occupied by members of TRG that is believed to be the current base of operations in Maine for the manufacture, packaging and distribution of controlled substances, storage of currency, and location where multiple firearms are likely to be kept (TARGET LOCATION 1); and

      b.      the residence of SHELBY KLEFFMAN, a large-scale drug customer of TRG members, and a location where TRG members are believed to have delivered narcotics and exchanged currency (TARGET LOCATION 2);

10.     Based on the content of cellular phones searched in this case, I know that KLEFFMAN is a large-scale drug customer of TRG members and a distributor in her own right, with her own large customer to whom she sells controlled substances. As such, I expect evidence of KLEFFMAN's drug distribution activities to be located in TARGET LOCATION 2.

## TARGET LOCATIONS

11.     TARGET LOCATION 1 is 20 Sixth Street, Bangor, Maine, which is a red, three story, single-family residence with a driveway to the right of the structure leading back to a garage. The entire premises and curtilage are subject to the control of the renters of the premises. As discussed below, there is probable cause to believe that TEJADA, MINIER, and HERRERA are employing TARGET LOCATION 1 as a base of operations for the distribution of controlled substances. A photograph of TARGET LOCATION 1 follows:



12.     TARGET LOCATION 2 is 4 Birch Heights Drive, Trenton, Maine. 4 Birch Heights Drive, Trenton, Maine is a white single-family residence, one-story structure with a porch facing the street. I know from the Trenton Maine assessor that 4 Birch Heights Drive, Trenton, Maine is owned by Neil Kleffman (a believed relative of Shelby Kleffman, specifically her father), who also lists 4 Birch Heights Drive, Trenton, Maine, as his mailing address. TARGET LOCATION 2 is believed to be KLEFFMAN's residence. As discussed below, there is probable cause to believe that Shelby KLEFFMAN resides at this location and that this is a location where she has met with TEJADA, HERRERA, MINIER and/or COLEMAN, and where controlled substances that have been obtained from HERRERA, TEJADA, BERNBAUM and COLEMAN have been delivered and cash received from KLEFMAN. A photograph of TARGET LOCATION 2 follows:



**PROBABLE CAUSE**
**ARREST AND SEARCH OF ULYSSE PHONE**

13.     On July 1, 2020, in Maine, law enforcement pulled over a vehicle being driven by COLEMAN in Maine as it travelled southbound to Massachusetts.  The passengers in the vehicle were ULYSSE and TEJADA.  This vehicle was stopped in order to effectuate the arrest of ULYSSE on an outstanding Massachusetts warrant.  During a search of the vehicle, law enforcement officers found six handguns and the lower receiver of a seventh handgun in the vehicle.  ULYSSE was arrested on the Massachusetts warrant and returned to the state, where he remains in custody.  During the course of ULYSSE's arrest, a cellular phone used by ULYSSE was seized (the "ULYSSE PHONE"), and has since been searched by investigators.

14.     The phone seized from ULYSSE during his arrest on July 1, 2020, was forensically extracted and searched by investigators.  The ULYSSE PHONE contained dozens of images and videos depicting firearms and numerous discussions relating to the manufacture and distribution of controlled substances in the Districts of Massachusetts and Maine.  A video dated June 30, 2020, was also discovered of COLEMAN and ULYSSE making TRG gang signs with their hands.

15.     In a text conversation, which dates from May 26, 2020 through June 30, 2020, ULYSSE and COLEMAN discuss various firearms and exchange images about firearms that are for sale in Maine.  COLEMAN and ULYSSE also discuss logistics about travelling to and being together in Maine.  There is also discussion about obtaining "work" which I know to be slang for controlled substances and firearms.

16.     One such conversation from the ULYSSE PHONE involved ULYSSE and COLEMAN discussing the use and transfer of various firearms in their possession (a "glock" and a "purple one");the sale of the firearm referred to as the "purple one"; and the status of the weapons available to their coconspirators.

17.     In another text conversation between ULYSSE and COLEMAN from June 25, 2020, COLEMAN and ULYSSE discuss logistics about a trip to Maine, including which vehicle they will use and how much money they have to obtain "work" to sell in Maine.  Specifically, ULYSSE states "If I was going back I would grab work."  Then, ULYSSE reiterates the amount of money he has available: "I got 6 plus 4 if shots pay me tod[ay]."  Based on my investigation of TRG, I believe "shots" to be a reference to TEJADA, whose known alias is "Shotz."  ULYSSE then notes that "if we all throw 10 we got 30", referring to a specific amount of money to purchase controlled substances to bring to Maine.

18.     Another text conversation located in the ULYSSE PHONE between ULYSSE and COLEMAN took place on June 30, 2020, in which COLEMAN and ULYSSE discuss various firearms available for sale in Maine as listed on the website "unclehenrys.com".  ULYSSE appears to have been browsing this website and taking screen captures of firearms for sale in Maine that he then sent to COLEMAN to discuss purchasing.  As noted, ULYSSE, COLEMAN and TEJADA were all in a vehicle containing six firearms and the lower receiver of a seventh firearm that was

traveling southbound from Maine when ULYSSE was arrested by Maine law enforcement on July

1, 2020.  Pertinent portions of that text message conversation follow:

| DATE AND TIME | AUTHOR | MESSAGE |
|---|---|---|
| 6/30/2020 8:45:41 PM (UTC-4) | 2079495114 Ulysse | Yo |
| 6/30/2020 8:45:48 PM (UTC-4) | 8572889197 Coleman | Yea |
| 6/30/2020 8:46:24 PM (UTC-4) | 2079495114 Ulysse | |





| 6/30/2020 8:46:36 PM (UTC-4) | 2079495114 Ulysse | That glizz come wit 30s |
| 6/30/2020 8:46:48 PM (UTC-4) | 8572889197 Coleman | Disliked an image |

| | | |
|---|---|---|
| 6/30/2020 8:46:51 PM (UTC-4) | 8572889197 Coleman | Disliked an image |
| 6/30/2020 8:46:56 PM (UTC-4) | 8572889197 Coleman | Disliked an image |
| 6/30/2020 8:47:00 PM (UTC-4) | 8572889197 Coleman | Disliked an image |
| 6/30/2020 8:47:03 PM (UTC-4) | 8572889197 Coleman | Disliked an image |
| 6/30/2020 8:47:14 PM (UTC-4) | 8572889197 Coleman | Already tried |
| 6/30/2020 8:47:18 PM (UTC-4) | 2079495114 Ulysse | Okok |
| 6/30/2020 8:47:23 PM (UTC-4) | 8572889197 Coleman | Emphasized an image |
| 6/30/2020 8:47:32 PM (UTC-4) | 8572889197 Coleman | Emphasized an image |
| 6/30/2020 8:47:40 PM (UTC-4) | 8572889197 Coleman | Those are stores |
| 6/30/2020 8:47:41 PM (UTC-4) | 2079495114 Ulysse | I want that beratta |
| 6/30/2020 8:47:44 PM (UTC-4) | 2079495114 Ulysse | Damn |
| 6/30/2020 8:50:15 PM (UTC-4) | 2079495114 Ulysse | |
| 6/30/2020 8:50:30 PM (UTC-4) | 8572889197 Coleman | Google how far China is |
| 6/30/2020 8:50:38 PM (UTC-4) | 8572889197 Coleman | You not even looking |
| 6/30/2020 8:50:56 PM (UTC-4) | 2079495114 Ulysse | Wym i ant lookin |

| | | |
|---|---|---|
| 6/30/2020 8:51:06 PM (UTC-4) | 2079495114 Ulysse | China is 50 min |
| 6/30/2020 8:51:13 PM (UTC-4) | 8572889197 Coleman | Your not looking how far that is |
| 6/30/2020 8:51:17 PM (UTC-4) | 2079495114 Ulysse | I am |
| 6/30/2020 8:51:26 PM (UTC-4) | 2079495114 Ulysse | China is an hr away |
| 6/30/2020 8:51:29 PM (UTC-4) | 2079495114 Ulysse | Thats far? |
| 6/30/2020 8:51:40 PM (UTC-4) | 8572889197 Coleman | Yea that's 2 hours |
| 6/30/2020 8:51:46 PM (UTC-4) | 2079495114 Ulysse | No its not |
| 6/30/2020 8:51:52 PM (UTC-4) | 8572889197 Coleman | Everything I been doing is here |
| 6/30/2020 8:51:54 PM (UTC-4) | 8572889197 Coleman | Bangor |
| 6/30/2020 8:52:16 PM (UTC-4) | 2079495114 Ulysse | China is next to water ville |
| 6/30/2020 8:52:37 PM (UTC-4) | 2079495114 Ulysse | Hr 9min |

19.    Additionally, within the ULYSSE PHONE investigators located a series of videos taken

of COLEMAN, ULYSSE and TEJADA holding firearms in various rural settings believed to be

in Maine.   In the videos, the firearms can be heard discharging, and bullets can be seen striking

the road.  According to the metadata on the video files, these videos were taken on June 19,

2020.  Still images from those videos follow:



| ULYSSE | TEJADA | COLEMAN |

20.     Another video depicts TEJADA firing a tan semi-automatic firearm with a black slide, and COLEMAN firing a silver firearm in a rural setting believed to be in Maine. According to the metadata on this video file, this video was taken on June 30, 2020. A still image from this video follows:



COLEMAN and TEJADA firing pistols

21.     Also in the ULYSSE PHONE investigators identified a video depicting COLEMAN using

a cellular phone to conduct a video call with another individual, while holding two firearms, with

an additional two firearms visible on a couch seat.  During the video, COLEMAN handles the

firearms to display them to the person he is video-calling.  COLEMAN's face can be seen captured

on the screen of the phone that COLEMAN is looking into.  Of particular note, a firearm that has

a tan frame and black side can be observed on the couch.  According to the metadata on the file,

this video was taken on June 30, 2020. The four firearms depicted in this video appear to be the

same firearms recovered on July 1, 2020, during the course of ULYSSE's arrest in Maine.  A still

image from that video follows:



22.     In another video, COLEMAN can be seen in a rural area holding a firearm and looking down at a cellular phone that is on the ground.  COLEMAN bends down to manipulate the phone in a manner consistent with using it to stream the image of him holding the firearm. According to the metadata on the file, this video was taken on June 30, 2020. A still image follows:



23. The search of a second phone used by ULYSSE revealed hundreds of text message conversations with individuals using a Maine area-code of 207, concerning the distribution of controlled substances, coordination of delivery of drugs or payment.

### ARREST OF COLEMAN

24. On January 5th, 2021, at approximately 14:35, COLEMAN and Elyjah ODNEY (a TRG associate) were stopped in Bangor, Maine. ODNEY was operating a Chevy Equinox bearing Maryland license plate number 5DM9212. The vehicle's renter was confirmed to be CHRISTINA BERNBAUM, a TRG associate and girlfriend of COLEMAN.

25. On January 6, 2021, at approximately 11:00 a.m., COLEMAN was surveilled leaving BERNBAUM's residence in a Chevy Equinox bearing Maryland license plate number 5DM9212 (the "Equinox"). Law enforcement was familiar with COLEMAN from past and ongoing investigations and was aware that COLEMAN's driver's license status was suspended. On

January 6, 2021, at approximately 11:45 a.m., agents observed the Equinox at TEJADA and HERRERA's residence. Shortly thereafter, at approximately 11:50 a.m., agents observed COLEMAN operating the Equinox leaving the area of TEJADA and HERRERA's residence.

26. Agents observed COLEMAN meet another person operating another vehicle and conduct what they believed to be a narcotics transaction with that other person. Specifically, COLEMAN parked the Equinox, exited it, and then got into the passenger seat of another vehicle and exited shortly thereafter. COLEMAN then reentered the driver's seat of the Equinox and drove away from the meeting location.

27. Shortly thereafter, at approximately 12:25 p.m., Lynn Police stopped the Equinox that COLEMAN was driving and arrested him for operating with a suspended license.

28. Following COLEMAN's arrest, the Equinox was searched pursuant to Lynn Police inventory policy prior to the tow of the vehicle. During the inventory search, a firearm was recovered that was determined to meet the definition of a machine gun. The firearm had a tan frame and black slide and was hidden underneath the center console, accessible from the driver's seat. The firearm was equipped with a "selector switch" attachment, also known as a "chip," that was attached to the rear of the slide. Selector switch devices turn semi-automatic firearms into fully-automatic machine guns by enabling an option for fully-automatic fire with a single pull of the trigger. This firearm was also equipped with a laser sight attached underneath the barrel in front of the trigger guard that had the letters "P3XL". The firearm had no serial numbers or identifying markings. Of note, the GLOCK logo on the selector switch had a section missing near the O and C in the word GLOCK. Near the firearm in the hide, a clear large-capacity 30 round magazine was recovered that contained 28 rounds of ammunition. Photographs of the seized tan-framed machine gun, the selector switch at the end of the slide, and clear extended magazine

follows:







29.     The firearm was further examined by Special Agent Jack Kelter of the Bureau of Alcohol

Tobacco and Firearms and was determined to be equipped with a fully-automatic selector switch attachment that allows the firearm to shoot in a fully-automatic mode without the user having to pull the trigger multiple times to fire multiple rounds. Special Agent Kelter conducted a dry test fire of the recovered firearm and preliminarily determined that it was a machine gun under federal law. Further testing and ballistics examination is currently ongoing.

30.     Under federal law, this firearm qualifies as a machine gun because when it is equipped with the selector switch, the firearm can shoot more than one shot by a single function (i.e., pull) of the trigger. See 26 U.S.C. § 5845(b). In fact, the selector switch itself qualifies as a machine gun because it is a "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b).

31.     Due to the fact that the firearm lacked a serial number, it is incapable of being registered with the ATF's database of registered National Firearms Act firearms. Special Agent Kelter also conducted a query of the ATF's National Firearms Act registration database and determined that JAIIR COLEMAN was not the registered owner of any machine gun or any other firearms that required registration under the National Firearms Act.

32.     The Equinox was determined to be a rental, rented from Hertz in the name of BERNBAUM, who arrived on the scene shortly after the firearm was recovered and took possession of the Equinox as the authorized renter.

33.     On January 7, 2021, COLEMAN was arraigned in Lynn District Court and charged with operating with a suspended license and various other offenses, including possession of a machine gun. COLEMAN has been held in custody since his arrest.

34.     BERNBAUM's cellular phone was later seized and searched during the course of this investigation. The search of BERNBAUM's phone revealed text messages indicating that

COLEMAN was in contact with BERNBAUM immediately prior to the arrest, while the Lynn Police were interacting with him. In the text messages, COLEMAN provides his location, and gives instructions to BERNBAUM about the whereabouts of controlled substances and a firearm in Maine. During the time of the arrest, investigators located a text message from COLEMAN to BERNBAUM stating "They broke the stash", meaning that the police had found the stash location in the vehicle and found what was inside. BERNBAUM replied, "No fucking way", "Jaiir wtf bro", expressing displeasure at the current state of affairs.

35.     COLEMAN then instructed BERNBAUM about the whereabouts of certain drugs using the term ("work"): "The work in Maine is in lazo room" "In the dresser under the last draw" "You gotta take it all out." In this exchange, COLEMAN is telling BERNBAUM that there are narcotics ("work") in a location in Maine, in a room, and that she needs to go retrieve it. COLEMAN then instructed BERNBAUM to, "Give my sitchy and stuff to let" "Ely", to which BERNBAUM replied "Okay". I believe "sitchy" is short for situation, which is a slang term for firearm. COLEMAN also texted BERNBAUM, "There perks in the top stash." I believe in this statement COLEMAN is telling BERNBAUM that there are Percocet pills ("perks") in a hidden compartment ("top stash") of the Equinox and that BERNBAUM should retrieve them.[2] During this exchange, COLEMAN also provided BERNBAUM with a phone number for TEJADA.

36.     During this same exchange, COLEMAN provides BERNBAUM with the address of "28 Jones Road" "Medway" and provides the phone number for his "good jug" to be 207-447-1186. I believe in this exchange COLEMAN provides BERNBAUM with the phone number and address for Jeff LADD, the resident of 28 Jones Road, Medway, Maine who is known to MDEA to be a

---

[2] As will be discussed below, COLEMAN later inquires about these controlled substances during a jail call with BERNBAUM. These drugs were not located by law enforcement on January 6, 2021.

drug distributor. By using the term "jug" COLEMAN is telling BERNBAUM that this individual is a person who purchases controlled substances, and "good" signifies that he purchases large quantities.

## CW-1 INFORMATION

37.    CW-1[3] has provided valuable information during the course of this investigation. I know from CW-1 and recordings and information generated by CW-1, and other investigatory efforts,



such as review of the COLEMAN PHONE, the BERNBAUM PHONE, TEJADA PHONE, and HERRERA PHONE, that were all seized and searched during this investigation that BERNBAUM (and by extension COLEMAN), TEJADA and HERRERA continue to derive extensive profits from the drug distribution in Maine. On February 26, 2021, CW-1 reported the following:



a. ████████████████████████████████████████
████████ ████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████

b. CW-1 knows TEJADA and HERRERA to keep large amounts of cash, as well as a "ghost" gun at their residence. CW-1 was not sure if drugs will be located at the residence for long periods of time, because HERRERA and TEJADA do not hold drugs for long periods of time and usually go to Maine to distribute them promptly after they receive them. ████████████████████
████████████████████████████████████████
████████████████████████████
████████████████████████████ These proceeds

████████████████████████████████████████
████████████ ████████████████████████████
████████████████
████████████████████████████████
████████████████████████████████
████████████████

█████████████████████████████████████████
████████████████████████████

[5] Investigators know TEJADA to be making a large amount of money from drug trafficking and believe that TEJADA stores the extensive proceeds of drug trafficking. This information from CW-1 was corroborated by a recording of David OTH on February 8, 2021, where OTH discusses recently providing TEJADA with a pound of methamphetamine and states that TEJADA is making a lot of money travelling to Maine to sell the drugs. OTH discusses being willing to sell the multiple pounds of methamphetamine he has on hand to TEJADA and/or CW-1 and that they can make substantial profits selling it in Maine. Investigators executed a search warrant at OTH's

were not recovered on March 4, 2021, and are believed to have been moved shortly before the search warrant was executed.

c. ███████████████████████████████████████████
███████████████████████████████████████████
███████ CW-1 knows BERNBAUM to be continuing to run COLEMAN's drug trafficking operation in COLEMAN's absence. CW-1 was aware from his time on the street that BERNBAUM makes multiple drug runs up to Maine each week to deliver controlled substances and to retrieve cash. CW-1 reported that BERNBAUM and COLEMAN rent vehicles from Hertz rental car and create hides in vehicles to stash drugs and firearms for trafficking purposes.

d. CW-1 generally described the extensive amount of money being made in Maine and the manner in which TEJADA, COLEMAN (and now BERNBAUM) would make multiple trips per week up to Maine in order to deliver controlled substances and retrieve cash from the sale of the controlled substances.

38. On February 8, 2021, CW-1 made a recording of DAVID OTH discussing the efforts of TRG members, including himself, and TEJADA to distribute multi-kilogram quantities of methamphetamine and cocaine and fentanyl in Maine. On February 8, 2021, CW-1 captured OTH giving the cocaine base to CW-1 on audio/video recording. The approximately 14 grams of cocaine base provided by OTH was later provided to FBI and field-tested with a TruNarc; and it tested positive for cocaine base. During the meeting, OTH described the state of TRG and various members' activities, and discussed in depth his multi-kilogram controlled substance enterprise. I have reviewed the recording and the following information was captured on the recording:

a. During a discussion about raising funds for a member of the gang, OTH states "I just gave Shotz [(TEJADA)] a whole pound of ice". I know "ice" to be a term for methamphetamine. OTH also indicates that he will have plenty of additional amounts and varieties of controlled substances available for the cooperating witness. OTH also states that TEJADA was moving "work" for his (TEJADA's) dad, meaning that TEJADA was obtaining controlled substances from TEJADA's father.

residence and multiple pounds of suspected methamphetamine and two firearms were recovered from OTH's residence in Lynn, Massachusetts on February 24, 2021.

b. OTH indicates that he has "ice", available to provide to the cooperating witness and indicates that it will be very profitable to sell it in Maine. OTH states that he will sell pounds of "ice" to the "homies" for $5,500. OTH indicates that an ounce of "ice" can be sold for $800, meaning that a pound can be sold for $12,800, while OTH is wholesaling the pound for $5,500.

c. OTH states that he recently texted TEJADA to inform TEJADA that OTH has three pounds of ice available for when he gets back from Maine that can be distributed in Maine. OTH then states he has the ice "ready" and that there is "a whole key in the house of that shit." The term "key" is slang for a kilogram, meaning that OTH is stating there is a kilogram of methamphetamine inside his house. OTH then states "Yea, that shits been sittin in my safe for a whole three months nigga".

d. During the recording, OTH describes having multiple sources of large quantities of controlled substances of various types, including cocaine, methamphetamine and fentanyl. OTH describes making these types of controlled substances available and indicates his willingness to sell them. OTH also states that he is willing to provide or sell a firearm to the cooperating witness. OTH also specifically describes having a source of supply that currently possesses 100 kilograms of methamphetamine.

e. OTH also describes the numerous firearms that he currently has in his house and shows the cooperating witness photographs of the firearms on his phone. During an exchange where OTH shows the cooperating witness pictures of the firearms, the cooperating witness describes one as a "sniper rifle" and OTH refers to another as "an AK" and another as a "Draco" while showing the pictures on his phone.[6] OTH also indicates in reference to one photograph: "that's a double snail" referring to a type of large capacity double drum magazine that resembles a snail shell, which often hold approximately 100 rounds. OTH then states "Nigga, I been collectin mad straps", meaning firearms. OTH also describes one firearm as a "ghost", referring to a ghost gun that does not bear a serial number.

f. While viewing the photographs of the many firearms, the cooperating witness tells OTH, "ya'll niggas is trynna go to war". OTH replies "that's my room nigga"; the cooperating witness asks, in reference to the photographs of the firearms, "that's your crib?" OTH replies "Yea, nigga." From this portion of the conversation, I believe OTH is showing photographs of the numerous firearms that he has accumulated. OTH indicates that the photographs are taken in his "room" in his "crib", which is 178 Ocean Street, Lynn, Massachusetts.

39. Additionally, CW-1 provided investigators consent to monitor incoming messages on a SnapChat account used by CW-1. CW-1 identified the SnapChat account of TEJADA, which has

---

[6] I know a Draco to be a term for an AK-47 style weapon that does not have a stock and has a shorter barrel.

the username of "Rmani".  On a date between February 12, 2021, and February 23, 2021,[7]

TEJADA sent CW-1 a video via SnapChat that depicted a large kilogram-quantity of controlled

substances, believed to be cocaine base.

40.     Additionally, on February 23, 2021, at 5:47 a.m., TEJADA posted a video to his SnapChat

that was accessible to the CW-1 account.  In that SnapChat video, a large amount of money that

appears to be in the multiple thousands is stacked on a table and is being counted.

41.     Within 24 hours of 9:00 a.m. on March 2, 2021, TEJADA posted a video to his SnapChat

that was accessible to the CW-1 account.  In that SnapChat video, TEJADA, who I identified by

his tattoos, can be seen wearing what appears to be a Cartier brand square face watch that is

completely studded in diamonds.  Based on this investigation, I know that this watch is an

extremely high-value item at retail and would only be significantly more expensive with the

hundreds of diamonds depicted in the video. Based on this investigation and information from

CW-1, I believe that TEJADA purchased this watch through the use of drug proceeds.[8]

42.     Based on the information provided by CW-1, I believe that TEJADA and HERRERA

continue to travel to Maine and make multiple trips to Maine per week to deliver controlled

substances and retrieve cash.  CW-1 has described the nature of COLEMAN and TEJADA's drug

trafficking organization in Maine which I have corroborated through review of COLEMAN's jail

calls and review of the cellular phones seized from ULYSSE, COLEMAN, BERNBAUM, and

_____

[7] I ████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

[8] I am aware of recorded jail call between COLEMAN and another individual taking place on or
about February 21, 2021, where they discuss how Shotz, meaning TEJADA, had recently
purchased a Cartier watch for "25 bands" meaning $25,000. I believe this is the same watch
depicted in the SnapChat video.

TEJADA. Essentially, COLEMAN and TEJADA have multiple contacts in Maine who receive the controlled substances and conduct retail-level sales of the controlled substances to consumers. Those contacts charge consumers a premium price in order to profit from the sales and provide a portion of the proceeds to BERNBAUM (who has taken over COLEMAN's side of the operation), and TEJADA. In order to have a central base for the drug distribution activities in Maine, BERNBAUM and other associated women facilitate the rental of AirBnb locations that are used by members of the DTO, including TEJADA, HERRERA, BERNBAUM herself and multiple other individuals.

43. Based on evidence gathered through physical surveillance, a review of records and reports, analysis of recorded telephone calls, search of digital devices, consensual recordings, and information from multiple cooperating witnesses, including CW-1 who reported information as recently as February 27, 2021, I believe that COLEMAN, JORDAN, BERNBAUM, TEJADA, and the various co-conspirators (including ELYJAH ODNEY) continue to operate a large and lucrative DTO transporting quantities of controlled substances to Maine for distribution and that they maintain ledgers and documents to record the drug trafficking activities, including customers, product sold, product purchased, payments made to suppliers and couriers, and other information.

44. Through the evidence stated above, including statements obtained from the COLEMAN PHONE, information provided by CW-1, and recorded jail calls, wherein COLEMAN, JORDAN, BERNBAUM, TEJADA, and co-conspirators discuss the drug manufacturing and distribution conspiracy, I believe there is probable cause that all of the items in the below paragraph and in Attachment B (attached hereto and incorporated herein) will be found in the TARGET LOCATION.

**CI-2**

45. ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ During a November 2020

proffer interview, CI-2 relayed the following:

    a. After viewing photograph arrays, CI-2 identified an individual known to him as "Chino," known to law enforcement as COLEMAN, and an individual known to him as "Shotz," known to law enforcement as TEJADA.

    b. CI-2 relayed that "Chino" and "Shotz" regularly travel to Maine to sell drugs, and that he purchased drugs, including marijuana, crack cocaine, and fentanyl pills from "Chino" and "Shotz" on numerous occasions in April, May, and June 2020.

    c. CI-2 stated that, across multiple months (generally April through June 2020), CI-2 sold approximately 15 to 20 firearms to "Chino" and "Shotz," both together and individually, in return for approximately $100.00 per each firearm purchased. CI-2 relayed that on at least two occasions, "Chino" and/or "Shotz" did not have cash to pay him and instead provided him drugs as payment.

---

9 ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████

d. CI-2 stated that he recalls "Shotz" telling him in July 2020 that they needed to get their story straight in case the police contacted CI-2, indicating what may be perceived as an attempt to obstruct justice by "Shotz."

e. In the days following the execution of a search warrant at TEJADA's residence on March 4, 2021, CI-2 reported to ATF that the contact associated with Shotz recent rejoined SnapChat.

## SEARCH OF COLEMAN'S PHONE

46. **SEARCH OF JAIIR COLEMAN'S PHONE**

47.     Following COLEMAN's arrest, investigators obtained a search warrant for two cellular phones found on COLEMAN's person at the time of arrest.  The content of one of the cellular phones appeared to be consistent with a longer period of use dating back to 2019 and seemed to be the primary phone used by COLEMAN (hereinafter the "COLEMAN PHONE").  A second phone appeared to be consistent with a phone focused on drug distribution activities. Both phones contained hundreds of text messages discussing the distribution of controlled substances with individuals employing a Maine area-code of 207.

48.     In the COLEMAN PHONE, numerous pictures and videos were located that depict COLEMAN holding, and brandishing numerous firearms, handling large stacks of currency, and drinking Belaire brand champagne inside of various motor vehicles.  Additionally, the COLEMAN PHONE contained hundreds, if not thousands, of text messages, pictures, and videos pertaining to firearms and the distribution of controlled substances, including cocaine, cocaine base, fentanyl, and marijuana, dating back multiple years.

49.     For example, a video located on the COLEMAN PHONE depicts bags of what appears to a large amount of cocaine base or fentanyl.  During the video, COLEMAN states, "a quick little 500 grams." The metadata from this video file indicates it was taken on September 6, 2020.  A still image from the video follows:



50.     COLEMAN was also engaged in a running text message conversation with TEJADA, who employed a cellular phone number of 470-656-4216, concerning the distribution of controlled substances starting in December 2020 through the date of COLEMAN's arrest on January 6, 2021.

51.     A text conversation between December 12-14, 2020 contains a detailed conversation including instructions to cut suspected fentanyl with certain proportions of cutting agent in order to adulterate the raw fentanyl and prepare it for street level distribution. The following are the pertinent portions of this conversation with my explanatory notes on the right:

| Timestamp | Author | Text | Note |
|---|---|---|---|
| 12/12/2020 5:32:45 PM | COLEMAN | Yo | |
| 12/12/2020 5:33:04 PM | TEJADA | Yo | |
| 12/12/2020 5:34:04 PM | COLEMAN | She gave me 42 hunnit | |
| 12/12/2020 5:34:45 PM | COLEMAN | 4250 all together and then the 80 she was short from last night so 4330 | |
| 12/12/2020 5:43:18 PM | TEJADA | Give lazy 2 bands | 2 bands means $2,000 |
| 12/12/2020 5:43:30 PM | TEJADA | U gave her the 50? From lazo shit or yours? | |
| 12/12/2020 5:43:44 PM | TEJADA | Take the other 2 sum change for u for a zip of that soft from yesterday | Zip of soft, means an ounce of cocaine powder |
| 12/12/2020 5:43:51 PM | TEJADA | U brought her a new one right? | |
| 12/12/2020 5:43:57 PM | TEJADA | And took the hard back? | Asking if Coleman took back the crack |

| | | | |
|---|---|---|---|
| 12/12/2020 5:45:12 PM | COLEMAN | The 50 I took from wgst was made I gave her the soft | A customer was provided 50 grams of cocaine powder |
| 12/12/2020 5:46:16 PM | COLEMAN | As yes she gave me the 11 grams of the hard back | Agreeing that he took the 11 grams of crack back |
| 12/12/2020 8:45:50 PM | COLEMAN | Katrina calling me but you already kno with her so I didn't answer | |
| 12/13/2020 12:07:53 AM | TEJADA | Yo | |
| 12/13/2020 12:17:12 AM | COLEMAN | Yo | |
| 12/13/2020 1:42:51 PM | TEJADA | Zip soft | A zip is an ounce, or approximately 28 grams |
| 12/13/2020 1:43:23 PM | COLEMAN | Yea it's on it way | |
| 12/13/2020 1:43:43 PM | TEJADA | What is | |
| 12/13/2020 1:44:15 PM | COLEMAN | The soft | |
| 12/13/2020 1:44:46 PM | COLEMAN | I gave them niggas they shit back to get new shit | |
| 12/13/2020 7:01:34 PM | COLEMAN | I got 2 zips of soft and 3 zips of hard the hard is fire it's all totally different promise I won't have niggas looking stupid | Coleman is reporting having 2 ounces, or 56 grams of cocaine powder, and 84 grams of crack |
| 12/13/2020 9:22:15 PM | TEJADA | Yea that shit fucked shit up | |
| 12/13/2020 9:22:33 PM | TEJADA | Go over there with 2 zips soft | |
| 12/13/2020 9:25:33 PM | COLEMAN | Ok I'm going and down ? | |
| 12/13/2020 9:25:44 PM | TEJADA | None | |
| 12/13/2020 9:25:50 PM | COLEMAN | Igh | |
| 12/13/2020 9:26:18 PM | TEJADA | My fault missed mad plays too she right | |
| 12/13/2020 9:26:23 PM | TEJADA | Tight and right lmaoo | |
| 12/13/2020 9:29:06 PM | COLEMAN | I'm going to bring her the hard to see too and I'll call when I get there I'm leaving now it's fire tho I promise we not gonna look dumb | Coleman assures that the new crack is "fire" meaning of sufficient quality |
| 12/13/2020 9:30:41 PM | COLEMAN | And if she takes the hard I'll charge her like 16-17 this one time so she will be happy I kno she gonna love it str8 dropped it | |
| 12/13/2020 9:31:14 PM | TEJADA | So that 28 of hard that was trash u took it back? | |
| 12/13/2020 9:31:21 PM | TEJADA | Or she still got it | |
| 12/13/2020 9:35:11 PM | TEJADA | Bring 56 soft | |
| 12/13/2020 9:35:26 PM | TEJADA | Then hard charge her 16 if she takes it | Instructing COLEMAN to collect money from the customer |
| 12/13/2020 9:35:57 PM | TEJADA | Take the other one back if not agree on a right price with her figure it out so we don't loose her cuz she was Odeeeing nbs in sum feen shit | Instructing COLEMAN to take back the drugs so the customer does not die from an overdose |
| 12/13/2020 9:36:21 PM | COLEMAN | Ok | |
| 12/13/2020 9:36:36 PM | COLEMAN | I'm here now I'll make her happy | |

| Timestamp | Author | Text | Note |
|---|---|---|---|
| 12/13/2020 9:38:31 PM | TEJADA | Ok | |
| 12/13/2020 9:41:19 PM | COLEMAN | She likes it | |
| 12/13/2020 9:41:40 PM | TEJADA | Hey | |
| 12/13/2020 9:41:46 PM | TEJADA | Bet* | |
| 12/13/2020 9:43:22 PM | COLEMAN | So she took the 2 of soft and the hard | |
| 12/13/2020 9:43:32 PM | TEJADA | Ight bet | |
| 12/13/2020 9:53:28 PM | COLEMAN | 77-37 =4<br>4-3 = 1<br>1 + 4 ( soft ) = 5<br>5 + 13hunnit ( hard ) = 13<br>I gave her 3 grams short that's why I charged 13 instead of 16 but all the math is right there just to save it | COLEMAN reports what he provided to the customer and gives amount ("math") so that E is aware and is preserved in writing |
| 12/14/2020 2:31:42 PM | TEJADA | Yo | |
| 12/14/2020 11:22:29 PM | COLEMAN | She owed 63 and she returned the zip so it's 43 and she gave me a band so it Larry bird 33 just putting it here so it's listed | The customer returned an ounce reducing the amount |
| 12/15/2020 9:26:31 AM | TEJADA | You | |
| 12/15/2020 9:26:32 AM | TEJADA | Yo | |
| 12/15/2020 9:26:34 AM | TEJADA | U up | |
| 12/15/2020 9:26:36 AM | TEJADA | He on his way | |
| 12/15/2020 9:26:40 AM | COLEMAN | Yup | |
| 12/15/2020 9:26:44 AM | COLEMAN | Lmk | |
| 12/15/2020 11:27:57 AM | COLEMAN | Complete | |
| 12/15/2020 11:28:28 AM | COLEMAN | 10 ball | |
| 12/15/2020 12:38:14 PM | TEJADA | Ight did u get the 3 from Sara too? | Referring to "Sara" a Maine drug contact |
| 12/15/2020 12:38:25 PM | COLEMAN | Yea | |
| 12/15/2020 12:38:39 PM | TEJADA | Ight I'm bouts to come | |
| 12/15/2020 12:38:48 PM | COLEMAN | Say less | |
| 12/15/2020 1:31:23 PM | TEJADA | Yo | |
| 12/15/2020 1:54:00 PM | TEJADA | Yo | |
| 12/15/2020 3:35:20 PM | COLEMAN | So 33-15=18 plus a zip and 50 down | COLEMAN reports another sale and the amounts he has remaining |
| 12/16/2020 9:39:59 AM | COLEMAN | K got snatched up shorty booked | COLEMAN reports that a customer was arrested |
| 12/16/2020 9:42:08 AM | COLEMAN | Also my Stephan and Miranda I think | Referring to two Maine drug customers Stephan and Miranda |

52.     Another such sequence took place on December 21, 2020, in which COLEMAN and TEJADA discuss the various amounts of uncut and cut crack cocaine and fentanyl they have available:

| Timestamp | Author | Text | Note |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 12/21/2020 4:11:33 PM | TEJADA | How much down u got left | TEJADA inquires how much fentanyl COLEMAN has available |
| 12/21/2020 4:12:03 PM | COLEMAN | Like 6 of raw 2 sticks already made | COLEMAN indicates he has 6 of raw, and 2 sticks (20 grams), of cut product |
| 12/21/2020 4:12:20 PM | COLEMAN | But we don't got no more cut unless I use the white shit | COLEMAN indicates he is out of the normal cutting agent but does have a white cutting agent |
| 12/21/2020 4:13:20 PM | TEJADA | Dam | |
| 12/21/2020 4:13:52 PM | TEJADA | We need 130 | Telling COLEMAN they need 130 grams |
| 12/21/2020 4:14:29 PM | COLEMAN | That's 13? Stick | COLEMAN replies asking whether this means 13 "sticks". |
| 12/21/2020 4:14:49 PM | TEJADA | Yea | |
| 12/21/2020 4:17:05 PM | COLEMAN | I there only like 6 | COLEMAN responds there are only 60 grams available (6 sticks) |
| 12/21/2020 4:18:44 PM | TEJADA | There's only enough for 60 until Tomorrow | |
| 12/21/2020 4:18:59 PM | TEJADA | I could double u on the new shit u wanted | |
| 12/21/2020 4:19:27 PM | COLEMAN | That's for them | |
| 12/21/2020 4:19:52 PM | TEJADA | Yea wrong person | |
| 12/21/2020 4:20:03 PM | COLEMAN | Start making it | COLEMAN states that TEJADA should start cooking and cutting the controlled substances |
| 12/21/2020 4:20:17 PM | TEJADA | Na lemme see what she say first | |
| 12/21/2020 4:20:24 PM | COLEMAN | Igh | |
| 12/21/2020 4:26:03 PM | TEJADA | Yo | |
| 12/21/2020 4:26:40 PM | COLEMAN | Yo | |
| 12/21/2020 4:34:21 PM | TEJADA | Bring the 6 and the 20 | Telling COLEMAN to bring the 6 sticks (60 grams of uncut controlled substances), and 20 grams of cutting agent |
| 12/21/2020 4:34:27 PM | TEJADA | There brown cut over there | |
| 12/21/2020 4:34:42 PM | COLEMAN | Over where ? | |
| 12/21/2020 4:34:57 PM | TEJADA | Mix it with 36 | |
| 12/21/2020 4:35:16 PM | TEJADA | Center | |
| 12/21/2020 4:35:27 PM | COLEMAN | Igh | |
| 12/21/2020 4:35:42 PM | TEJADA | And bring her what I got | |

53.     Another such text message exchange took place on January 5, 2021 and the morning of January 6, 2021, a short time before COLEMAN was arrested in Lynn and the machine gun was discovered in the Equinox, in which TEJADA and COLEMAN discuss the amount of fentanyl they have available and arrange for COLEMAN to come to the location I know to be TARGET LOCATION 2 to retrieve it and an amount of cocaine.

| Timestamp | Author | Text | Note |
|-----------|--------|------|------|
| 1/5/2021 10:08:35 PM | TEJADA | Yo | |
| 1/5/2021 10:08:46 PM | TEJADA | How much u got left of down | TEJADA inquires how much fentanyl COLEMAN has left |
| 1/5/2021 10:12:01 PM | COLEMAN | .5 | |
| 1/5/2021 10:12:10 PM | COLEMAN | 5 grams | |
| 1/5/2021 10:12:46 PM | TEJADA | No Gustavo | |
| 1/5/2021 10:13:19 PM | COLEMAN | I kno I was waiting for the new year to get right | COLEMAN was waiting until this new year to buy more |
| 1/5/2021 10:13:35 PM | COLEMAN | So re on the soft too | COLEMAN says he also does not have any cocaine powder |
| 1/5/2021 10:13:56 PM | TEJADA | Yea | |
| 1/5/2021 10:13:59 PM | TEJADA | Asap | |
| 1/5/2021 10:16:29 PM | COLEMAN | Off rip I need the 60 and I'm figuring out the soft now | COLEMAN tells E he needs 60 grams of fentanyl and he is figuring out how much cocaine powder he needs |
| 1/5/2021 10:16:45 PM | TEJADA | lght | |
| 1/6/2021 10:00:31 AM | COLEMAN | U awake | |
| 1/6/2021 10:18:53 AM | TEJADA | Yea | |
| 1/6/2021 10:22:46 AM | COLEMAN | Shower an I'm on my way | |
| 1/6/2021 10:26:10 AM | COLEMAN | Question tho will they cook it | COLEMAN asks if the people from whom they are buying the drugs will cook it into crack for them |
| 1/6/2021 10:53:14 AM | TEJADA | Na | |
| 1/6/2021 10:53:26 AM | TEJADA | Wait how much up u need | |
| 1/6/2021 10:53:34 AM | TEJADA | Cuz I didn't even ask bout that | |
| 1/6/2021 11:02:51 AM | COLEMAN | Lemme grab 2 | COLEMAN says he needs two, which I believe to be ounces, or approximately 56 grams. |
| 1/6/2021 11:03:15 AM | COLEMAN | And I'm on my way | |
| 1/6/2021 11:04:17 AM | TEJADA | It's by 31 tho | |
| 1/6/2021 11:05:14 AM | COLEMAN | Ok yea grab the 2 I'm on my way with the money | COLEMAN confirms the purchase and says he is on the way. |
| 1/6/2021 11:05:24 AM | COLEMAN | And F | |
| 1/6/2021 11:31:16 AM | COLEMAN | Yo | |
| 1/6/2021 11:32:05 AM | TEJADA | Yo | |
| 1/6/2021 11:32:41 AM | COLEMAN | Buzz I'm here | COLEMAN indicates he arrived at the purchase location |

54.     Investigators also located a text message conversation of over 700 messages on the

COLEMAN PHONE that involved the phone number of 207-217-1186, which I believe to be used

by Jeff LADD. During this conversation, LADD and COLEMAN arrange for the delivery of large

quantities of controlled substances to Maine. In numerous messages, LADD directs COLEMAN to "come up" and "bring up" controlled substances to Maine.

55.     For example, on September 29, 2020, LADD texted COLEMAN, "Need see ya this week Thursday able come up what about soft serve", which I know to mean LADD directing COLEMAN to bring up cocaine powder ("soft serve") to Maine ("come up").

56.     On September 30, 2020, LADD orders a "Zip of each hard @n soft fifty otherthings", which I know to mean 28 grams of cocaine base ("hard") and 28 grams of cocaine powder ("soft") and fifty pills ("otherthings"). LADD then asks, "Whats up are you comong up yes or no need know".

57.     On November 19, 2020, LADD texts COLEMAN, "Able come up tomr have lunch" and COLEMAN responds, "Yes what time" "And what's on the menu". LADD replies "Two same hard candys if it like it was before and one thing I like call shortly k". I believe in this exchange, LADD is arranging for COLEMAN to deliver narcotics to 28 Jones Road, Medway, Maine, and that he is ordering 2 ounces of cocaine base ("hard candys") and one ounce of another controlled substances, possible cocaine powder.

58.     On November 28, 2020, LADD texted COLEMAN, "Holla at ya think tomr be good let ya know whats gunna go on kk" and COLEMAN replies "What's on the menu". LADD responds, "Most likely two hard candy and fifty and what stop for other day same". In this exchange, I believe LADD is asking COLEMAN to come up to Maine tomorrow, and COLEMAN asks what type of controlled substances he is looking to purchase ("what's on the meanu" (sic)). LADD then responds that he wants two ounces of cocaine base ("two hard candy") and fifty of cocaine powder ("fifty").

59.     On January 3, 2021, LADD texted COLEMAN, "Any chance getting price down on soft if was get two of them  one hard and same amount blue" and COLEMAN responded, "I only got hard rn at the moment" "I ain't been able to find a steady line on the soft cus ppl don't be having the quality".  I believe in this exchange LADD requests whether he can get a lower price for cocaine powder ("soft") if he was to purchase two ounces ("two of them")., and then one ounce of cocaine base ("one hard"), and a blue controlled substance, believed to be pills.   COLEMAN responds that he only has cocaine base ("hard") and is having difficult locating cocaine powder ("soft").  After delaying the delivery, on January 5, 2021, COLEMAN tells LADD that he is "coming off the exit getting gas then I'll be there" "So less than 10 min boss", meaning that he is just arriving.

60.     Review of the device locations from the COLEMAN PHONE and COLEMAN's second Maine phone revealed GPS coordinates  in the immediate vicinity of 28 Jones Road, Medway, Maine on January 5, 2021, which indicates that COLEMAN was in Maine likely delivering narcotics on the day before he was arrested, delivering the controlled substances described in the text messages. This is also confirmed by information derived from a ping order on COLEMAN's phone that placed him 2.19 miles from 28 Jones Road, Medway, Maine, on January 5, 2021, at 17:22.

61.     On January 5, 2021, at 15:34 TEJADA texted COLEMAN, "How much I got left" "Of Down".  COLEMAN replies, "Imma check when I get there but it's a nice size".  TEJADA then states "Ight lmk". COLEMAN later responds at 18:14, texting "23".  I believe in this exchange TEJADA asks COLEMAN how much he left of fentanyl ("down") at the AirBnB rental location that they are using in Maine, and TEJADA is not currently there.  COLEMAN replies that he will let TEJADA know when he arrives, and then almost three hours later informs TEJADA that he

has 23 grams of fentanyl left ("23"). I believe the timing of this exchange, along with the information concerning the stop of COLEMAN and ODNEY in the Equinox in Maine on January 5, 2021, coupled with the ping information on COLEMAN's phone proves that COLEMAN checked the amount of fentanyl remaining at a location in Maine once he arrived (likely an AirBnB rental referred to by COLEMAN in his text messages with BERNBAUM discussed below), and that during the same trip to Maine COLEMAN travelled to 28 Jones Road, Medway, Maine to deliver an amount of drugs to LADD.

**JAIL CALLS**

62.   Following COLEMAN's arrest on January 6, 2021, he has been detained at the Essex County House of Correction. COLEMAN has made a number of calls on a recorded jail line that establish the scope and substance of the drug distribution conspiracy. Prior to each of these calls, inmates are informed that the calls are being recorded and that they may be furnished to law enforcement.

63.   During one such call taking place on January 11, 2021, COLEMAN spoke with BERNBAUM. Therein, he instructs BERNBAUM on the manner by which she is to obtain and cut controlled substances while COLEMAN is incarcerated. The conversation begins with BERNBAUM discussing the sale of the remaining controlled substances to an individual named Sara. BERNBAUM is worried that she was played by "Sara" because BERNBAUM did not know what she was selling or the proper price. The conversation continues:

> JC:   Yeah, you should know that. Up, gets you up. Down is slumped over scratching your face.
>
> CB:   Yeah, I know the difference of the effects of what it does. I don't know the difference of what the fuck it looks or tastes like. I, I thought I did.
>
> JC:   Shh, shh. Hey man, I don't have enough time, listen. Up is soft or hard. Straight up, I don't got time for this. Up is soft or hard. That's it.

CB: Okay.

JC: I know you give it to her hard because I make, yeah. I know you give it to her hard because I make more bread. There is no such thing as soft right now. With Kemoni, he gets the hard. With the hard. When you buy it off Kemoni. Tell him to turn two zips into three and you'll be Gucci. Just keep doing that. Don't do nothing more, don't do nothing less.

CB: Right, but, but, but what I'm saying why I think she played me is I thought it was up, she said it was down. That's what she purchased.

JC: And down is F-E.

CB: Yes, I know that and I thought that that was a completely different color than what it was. That's why, like.

JC: Because the F-E turns a color once I cut it.

64.    I believe that in this conversation, BERNBAUM is telling COLEMAN that she was not aware of whether she was in possession of cocaine ("up") or fentanyl ("down").   COLEMAN instructs BERNBAUM to ask the source of supply, "Kemoni" BOONE, to cut two ounces of fentanyl for her and make it in three ounces so that it can be sold for greater profit.   COLEMAN informs BERNBAUM that she erroneously sold the uncut ("fire") fentanyl ("F-E"), and that fentanyl turns a distinctive color when it is cut.   The conversation then continues to discuss how BERNBAUM sold uncut fentanyl:

CB: Yeah, I know. So, was there something that wasn't touched yet?

JC: Yeah, it was fire. You have to cut it bro. And every, and what. Listen. Whatever you. You can't (UI) all at once. You have to do it in increments because it will turn dirty. You gave it to her like that?

65.    COLEMAN instructs BERNBAUM how to cut fentanyl and "to do it in increments because it will turn dirty."   COLEMAN then instructs BERNBAUM on the method in which to add a cutting agent to the uncut fentanyl ("fire") without turning it a different color ("dirty").

JC: Alright, bet. Back to the business. So listen, so whatever you do. Like, say you get a point five of fire or point four of. I know you do a point fours. I mean four grams. You get a four grams of fire, you hit. You times that by six and that's how

38

much cut you put in it to make it what it is. So, four times six will get you twenty-four. Right? Twenty-four grams.

CB:     Okay, okay. Like, that's not helping me cause that's already, that's already gone.

66.     After COLEMAN provides the precise amounts of cutting agent to add per gram of fentanyl, BERNBAUM responds that the manner by which to cut the fentanyl is meaningless because it is "already gone," meaning that she already sold the uncut fentanyl without having added cutting agent to it. COLEMAN is outraged that BERNBAUM sold the uncut fentanyl:

JC:     How much did you give her?

CB:     Everything that was there.

JC:     Oh my god. How much was it? How much did it fucking weigh?

CB:     Fifty-five.

JC:     Sixty-five?

CB:     Fifty-five.

JC:     Fifty-five?

CB:     Yeah.

JC:     And how much did she give you? How much money?

CB:     Seventeen.

JC:     Seventeen what? Hundred?

CB:     Yeah.

JC:     Yeah, she owes you way more than that.

67.     BERNBAUM explains that she sold the entire amount of the remaining 55 grams of uncut fentanyl for $1,700 to Sara. Of note, the text message conversation between COLEMAN and TEJADA, described above indicated that COLEMAN obtained 2 ounces, or approximately 55 grams, of fentanyl at 11:30 AM on January 6, 2021, about one hour before he was arrested, at a time consistent with his vehicle being in the area of TEJADA's residence on First Street in Salem,

Massachusetts. As a result, I believe that BERNBAUM in fact sold the uncut fentanyl that COLEMAN had purchased an hour before he was arrested, which was located in the Equinox and not recovered by police. COLEMAN responds that BERNBAUM should have received far more money for the uncut fentanyl. As COLEMAN explains, the price BERNBAUM received was for "when it's cut already", not when it is uncut ("fire"):

CB:     Every ten was three-hundred. That's what she said.

JC:     That's when it's cut already, baby. Not when it's fire.

CB:     Okay.

JC:     Listen, write this in your notes.[10]

CB:     Yes.

JC:     And when I call you tomorrow, (UI). Listen. You listening?

CB:     Yup.

JC:     You gave her fifty-five untouched?

CB:     Yeah, I think it was in like a hard. Like a rock.

JC:     Babe, what are you saying?

CB:     It was, it was in a form. It wasn't, it wasn't powder.

JC:     Okay, so listen. You, how much did you, how much did you buy that for?

CB:     I didn't buy that.

JC:     Where was it?

CB:     I had it. That's just, that's what was from what was there.

JC:     What? At the, at the crib?

CB:     Yes. If that's what. That's what I'm saying. I didn't touch nothing. I didn't do nothing. I just tried to get rid of what, what I had.

---

[10] Investigators did in fact find a "Note" file in BERNBAUM's PHONE reflecting the information relayed to her by COLEMAN in this recording.

JC:     (UI) at the crib. (UI) I was just thinking cause I was like, what the fuck is she talking about. Alright, so boom. Fifty-five. Times that by six right now on your phone. No, times it by four. No, yeah six. Fifty-five times six.

CB:     Three-thirty.

JC:     Three-thirty, right?

CB:     Uh huh.

JC:     And for every ten grams of that three-thirty, that's thirteen grand. Right? Nope, that's thirty-three grand. Right?

68.     As COLEMAN explains, for every gram of fentanyl, BERNBAUM should add 5 additional grams of cutting agent in order to turn the original 55 grams of uncut fentanyl into 330 grams of cut fentanyl. COLEMAN explains that BERNBAUM can sell 10 grams of cut fentanyl for $1,300 (he mistakenly states "thirteen grand" though I believe he means $1,300), which means that BERNBAUM should have been able to sell the total amount of 330 grams of cut fentanyl for approximately $33,000; though the real calculation would be approximately $42,900 (i.e, thirty-three 10 gram quantities, each sold for $1,300).

69.     Another jail call took place on January 17, 2021, between COLEMAN and BERNBAUM. During the call, they discuss BERNBAUM learning from a contact at Hertz that the Equinox had been investigated by "the boys", meaning the police. During the call, they discuss the fact that Hertz "Corporate" had inspected the vehicle and noticed some damage, which prompted a call to BERNBAUM by an individual at Hertz who was friendly to BERNBAUM about a pending charge for the damage. COLEMAN is immediately distressed by the police interest in the vehicle and asks BERNBAUM if she "got the ones up top?" BERNBAUM responds, "Yeah" and after a brief exchange confirming that they are speaking about the same thing, which they will not identify openly, BERNBAUM states "Yeah, They're already-already… they are already been gone." COLEMAN then responds, "Yeah. I didn't know if you left them or not. Cause that'd be my only

worry." I believe in this conversation, COLEMAN inquires if BERNBAUM had retrieved some controlled substances that were stashed in the Equinox "up top" in a concealed location. No controlled substances were seized by law enforcement from the Equinox on January 6, 2021. BERNBAUM responds that yes, she had retrieved and already sold the controlled substances ("they are already been gone"). I believe that the 55 grams described in the earlier conversation, purchased about an hour before COLEMAN was arrested, were in fact in the Equinox at the time of COLEMAN's January 6, 2021 arrest but not seized by law enforcement. As she reported in an earlier jail call described above, and confirmed by text messages from BERNBAUM's phone, BERNBAUM retrieved that package of fentanyl and pills and sold it without adding cutting agent.

70. On January 19, 2021, in a call with COLEMAN, BERNBAUM discusses doing drug deals in a rental car and states that she has another one to do the following day. Further, in sum and substance, BERNBAUM tells COLEMAN that the business is hers now and that she is going to keep the profits; COLEMAN claims that he is the boss of the business. Portions of a draft transcript of this call follow:

CB: Yeah, I'm, I'm sittin' here trying to get rich, nigga. There's not all this money can go to you. I'm going to fucking get my eyebrows, my eyelashes, and my nails done tomorrow. Fuck you.

JC: Yeah. All on JC. You're welcome, big daddy.

CB: No, no, no, no, no. All on Tina. This is…this is Tina's operation now.

JC: Yeah, right. I'll slap the shit out you.

CB: Like, the fuck? You don't…you don't know the numbers. I'll leave…I'll leave you what you started with. Don't worry. Everything will be paid for.

JC: I'll beat your ass.

CB: [UI] I can't use some of the money? Like, what?

JC: Of course you can, but not how you're thinking. You're not gonna be spending money like how I was spending money, cause you're not the boss. I'm the boss.

CB:     Uh, yeah. Right now? I am.

JC:     Alright, come on. Keep getting too comfortable. See what happens. You'll still get left when I come home.

CB:     Okay.

JC:     Mmhmm. Watch.

CB:     Okay.

## A.     JANUARY 28, 2021

71.     On January 28, 2021, in a call with COLEMAN, BERNBAUM discusses her continuing efforts to distribute narcotics in Maine, and her coordination of the drug distribution on behalf of COLEMAN.  In particular, COLEMAN mentions his contact in Maine ("Sara") and describes issues regarding collecting money from her, and then BERNBAUM describes getting a hotel room in Maine so that she can break up the long drive.

JC:     But, you already know where it's comen from. Fucken, he just you know wants to fucken. I, I feel like fucken. Cus, alright. So what it is, Sara and her boyfriend be beefen and shit, like, cus he's a fucken clown. Anyway, he does. He'll take, he'll take this nigga's, Gustavo's bread, and like break up with Sara for like three, four days and spend all the bread. And, then, try to come back and be with Sara to get, you know, more bread.

(Investigators know "Gustavo" to be an alias of TEJADA and "bread" to be a reference to money or proceeds. The individual SARA is believed to be a Maine drug contact.)

CB:     Yea, naw. I already, but that, but that's why I was sayen to you like cus even he.

JC:     I feel like he, the nigga Craig, try to like oh. Try to say to this nigga Gustavo, oh think that Sara's doin shit behind your back, da da da da da da da. Cus, I know for a fact Shotz didn't take her phone and go through it, you feel me?

(Investigators know "Shotz" to be an alias of TEJEDA.)

CB:     No. He woulda seen a lot more if he did.

JC:     Prolly just the boyfriend bein a fucken maggot. And then this nigga like, I don't want nobody, I don't want nobody talken to her and shit, but I know you don't. Huh?

CB:     Naw, that, that was my thing though. Like, as far as he's concerned, I hit her up that one time and he told me to dead it and its be deaded. I haven't even brought that shit up. The only time it gets brought up is when this nigga fucken Ju calls me.

CB:     It's just annoying like. And I, and I just have a feeling that this nigga Sparks is gonna hit me up again asking for it. No bullshit."

JC:     I'mma tell Ju. I'mma tell Ju to, feel me, relay the message but, aint really no reason to. Naw, I already know what's goin on so. You feel me?

CB:     No. I, which I get that but that's not. That's not happening right at this moment anyway, so it's like why does it matter who has them?

JC:     Because, like I said, the nigga feels like you, you, you're still seein her. You feel me? You're not understanding what I'm sayin.

CB:     No I don't understand.

JC:     So if this nigga Sparks has the card. Then, he a feel more comfortable in his head that you don't talk to her. Period. You know what I'm sayen?

CB:     Uh huh.

JC:     Because he wants all, he wants all his backends. He don't want. He don't even want a dollar bein spent your way. You get what I'm sayen?

…

CB:     Tomorrow, I just have to take Stella to the dentist. After school, bring her back to Jules and then, me and Brins gonna go stay in a hotel for the night, so we can come back on Saturday. Like early.

JC:     Oh, my fault. Oh, yea. You're goin up. I was like what the fuck you goin to a hotel for?

(Investigators believe "goin up" is a reference to traveling to Maine.)

CB:     Right. Like, I was waiting for you to say something. Like, did I say something wrong, like?

JC:     I had to think real quick, before I snapped.

CB:     No, cus it just, it just makes more sense cut the, cut it in half instead of all at once.

(Investigators believe "cut it in half" is a reference to the travel time to Maine.)

JC:     Yea. You guys gon drink fucken. And fireball all night.

CB:     Yea, so we could just at least like, you know, be there, relax, and then do what we gotta do and come home and not have it be like all day type shit because, like, Stellas not gone for the weekend. I have to get her back at a reasonable time on Saturday. So, it was only $70.

JC:     Naw, I know its cheap out there. Excuse me.

CB:     Not the fucking casino wants like 150. That's what I was lookin at. That one was kinda cheap, but no. The other one I got like it think it was like Four Points or something, it was like $69, so I'm like yep. I already booked it. Its already all set.

JC:     Yea, I think that's near like the Denny's and shit that we go to.

CB:     Uh, near the airport?[11]

JC:     Yea.

CB:     Is that near the air?

JC:     Yea.

CB:     Uh huh. So, that's where we'll be tomorrow. Um, like prolly not til later though cus I do have to take Stella to the dentist, but."

## B.    FEBRUARY 25, 2021

72.    On February 25, 2021, at 18:29, COLEMAN called BERNBAUM on phone number 617-991-0586. During the call, they discuss how BERNBAUM had recently met with "Mr. Jones", who I know to be a drug connection and person to Maine to whom BERNBAUM distributes controlled substances. Based on this, I believe BERNBAUM continues to operate aspects of COLEMAN's DTO while COLEMAN is incarcerated.

---

[11] Investigators know there is a Four Points by Sheraton hotel located at 308 Godfrey Blvd, Bangor, ME 04401, which is near the airport.

73. Through review of the cellular phones seized in this case, investigators have identified "Mr. Jones" to be a drug customer named Jeff LADD who is believed to reside at 28 Jones Road, Medway, Maine. The phone number for "Mr. Jones" (207-447-1186) and 28 Jones Road, Medway address for Mr. Jones are believed to have been provided to BERNBAUM by COLEMAN in the minutes after he was pulled over by Lynn Police on January 6, 2021, and the individual at this address was described as his "good jug". In at least one text message conversation on February 12, 2021, recovered from BERNBAUM's phone, BERNBAUM directs a coconspirator, LUIS FRANJUL to 28 Jones Road, Medway, Maine to deliver controlled substances and/or retrieve currency.

74. In a text message conversation dated February 24, 2021 located in the BERNBAUM PHONE, BERNBAUM tells the user of the 1186 phone (a contact saved as "Jones Rd"), who is believed to be LADD that she is on her way to see him and then indicates that she is "Here". On February 27, 2021, BERNBAUM asked LADD, "How was the Zan's" meaning how were the Xanax pills that were delivered. LADD responded "Their good just depending on prise". BERNBAUM replies, "Said more you get the price goes down but lowest he do is 7." In this conversation, LADD indicates the Xanax pills were good, but the price is determinative. BERNBAUM replies that her source indicated that if LADD were to purchase the price would decrease but not go below 7 dollars per pill.

75. I am also familiar with a 4 minute long voicemail recording located in BERNBAUM's phone where she received a call from the 207-447-1186 phone number, used by LADD. This recording was from February 13, 2021, at 11:22 and appears consistent with LADD calling BERNBAUM immediately prior to her arriving at his residence. The phone call was not terminated and it captures a male I believe to be LADD and BERNBAUM discussing and

consummating the sale of controlled substances in person. During the recording they discuss "blues" meaning pills. BERNBAUM indicates that the drugs are "fire" and that no one should complain about the quality of the drugs. I believe that this recording resulted because LADD did not end the call he made to BERNBAUM and the voicemail continued recording while BERNBAUM arrived and delivered the controlled substances. This would be a prior delivery than the one discussed via text message on February 24, 2021, discussed above.

76.     Review of the device locations from BERNBAUM's phone revealed GPS coordinates of in the immediate vicinity of 28 Jones Road, Medway, Maine on February 6, 2021 at approximately 08:20, which signifies yet another delivery to LADD by BERNBAUM.

## SEARCH OF BERNBAUM'S RESIDENCE

77.     On March 4, 2021, investigators executed a search warrant at BERNBAUM's residence located at 53 Porter Street, Malden, Massachusetts. During this search, investigators located BERNBAUM in bed in her bedroom with her four-year-old daughter laying next to her.

78.     In BERNBAUM's bedroom, investigators located a vacuum sealer and a notebook that appeared to be a drug ledger of amounts paid, and owed.

79.     On the nightstand next to BERNBAUM's bed, a few feet away from where her four-year-old daughter was located, investigators located a box of plastic bags, and within the box there were two plastic bags. One of the bags contained an amount of white rock-like substance that appeared consistent with cocaine base (item 31). The other bag contained a white powder substance that appeared consistent with cocaine (item 33) and tested positive for cocaine on a field test. Photographs of the items recovered from the nightstand follow:







80.     In the closet of BERNBAUM's bedroom, investigators located a children's Minnie Mouse bag (believed to be a lunchbox) with BERNBAUM's daughter's name on the back. Inside of the lunchbox, investigators located five drug scales (item 22), and a white powder substance that was in a clear bag (item 21), which tested inconclusive on a field test. Inside another bag within the lunchbox, investigators located approximately 50 pills that tested positive for the presence of fentanyl on a field test (believed to be fentanyl pressed into pill form) (item 27). Also in the closet of BERNBAUM's bedroom, investigators also located a ballistic plate-carrier vest, and a round of 9mm ammunition. Photographs of the Minnie Mouse lunchbox and its contents follow:









81.     In a dresser in BERNBAUM's bedroom, investigators located a New York Yankees hat, and approximately $16,000 in cash of what are believed to be drug process.

**SEARCH OF TEJADA AND HERRERA'S RESIDENCE AND PHONES**

82.     On March 4, 2021, investigators executed a search warrant at TEJADA and HERRERA's residence located at 4 First Street, Unit 9102, Salem, Massachusetts. TEJADA and HERRERA were present in the location at the time of the execution of the search warrant. During the search investigators located two safes, and materials and items consistent with the manufacturing, packaging and distribution of controlled substances.   Among the items located during the execution of the search warrant were the following:

a.     a diamond encrusted Cartier brand, Santos watch, which I know to have an estimated value of $25,000;
b.     approximately $1,400 cash;
c.     three drug scales;
d.     plastic bag containing two hard blocks of a white substance;
e.     a "Safescan" money counter;
f.     a vacuum sealer;
g.     a container of lactose powder, which I know to be a cutting agent;
h.     multiple boxes of plastic bags; and
i.     three plastic bags containing an off-white powder-like substance.

83. The two hard blocks of a white substances did not test positive for controlled substances on multiple field tests. However, the results of the field tests were not consistent, and I believe that these blocks may in fact be heavily adulterated controlled substances, as it is uncommon for cutting agents or other substances to be pressed into hard blocks. I also know from review of TEJADA's phone that on a number of occasions Maine drug customers returned controlled substances due to the potency being weak.

84. Investigators also located numerous receipts for purchases expensive items being paid for in cash, such as $2,700 at Gucci; $2,820 at Moncler; $2,000 at Gucci; $4,300 at Saks Fifth Avenue; $1,721 at Saks Fifth Avenue; $2,720 at Neiman Marcus; $2,500 at Riccardi; $4,525 at Neiman Marcus, and $5,475 at Rodeo Cosmetics in Beverly Hills, California.

## A.  TEJADA PHONE

85. In a phone recovered from a jacket, investigators located the phone used by TEJEDA ending in 4216 (the "TEJADA PHONE") described above. The extraction of this device identified it as "RMani's iPhone" and further associated with a gmail account in the name of TEJADA. This phone contained thousands of text messages with drug customers and suppliers, where TEJADA discusses distributing and manufacturing controlled substances, and arranges for their delivery. Many of the contacts are listed to have 207 area codes consistent with the contacts being from Maine.

86. In the TEJADA PHONE, investigators located a conversation with a phone number ending in 1525, that investigators know to be used by TRG leader, DAVID OTH (this is the same phone number used by OTH with CW-1 above). In the conversation, TEJADA and OTH discuss the distribution of large quantities of controlled substances. Based on the text message conversation, on or about December 22, 2020, TEJADA received one pound of controlled substances that I

believe to be methamphetamine. In one particular part of the text message conversation taking place on January 30, 2021, OTH tells TEJADA that he has three pounds of a controlled substance that he is "holding" for TEJADA.

87.     On February 24, 2021, investigators executed a search warrant at OTH's residence and seized three pounds of methamphetamine. That same day at 11:41, TEJADA texted a drug distribution contact with a 207 area-code and phone number ending in 3319, that his source of supply for the methamphetamine ("boy with the burr") was just raided. I believe "burr" is a reference to shivering, and thereby a reference to ice, a common term for methamphetamine. In a text message on January 7, 2021, located on the TEJADA PHONE, TEJADA a drug contact to use the term "burr" in reference to "ice", meaning methamphetamine. On March 3, 2021, the contact with a 207 area-code and phone number ending in 3319 texts TEJADA, "I need ice lol", which I believe to be a request for methamphetamine. TEJADA responds, "Gotta make sure all that's on lock b4 I can flood u again", which I understand to mean that he need to locate another source of supply for methamphetamine before he can provide large quantities ("flood").

       B.     IDENTIFICATION OF KLEFFMAN

88.     In another text message conversation in the TEJADA PHONE, TEJADA discusses distribution of controlled substances with a phone number 207-569-5342, I believe to be used by Shelby KLEFFMAN. This contact is identified as "Shelby" and she discusses biographical details during the conversation that corroborate my belief that the individual is KLEFFMAN. Also in the TEJADA PHONE, investigators located a conversation between TEJADA and MINIER (using the 781-990-9438 phone number), where TEJADA sends a photograph of a Western Union receipt where Shelby KLEFFMAN paid $2,500 money to Lucy Hirayda Rosario DeTejada. I believe this to be the LUCY ROSARIO responsible for currently renting TARGET LOCATION 1, and an

associate of TEJADA and MINIER. In the address field on this receipt, KLEFFMAN lists the 4 Birch Heights Drive, Trenton, Maine address.

89.     Through review of the content of the TEJADA PHONE, additional numbers believed to be associated with KLEFFMAN include 207-605-6399, and 207-659-6546. In these conversations with KLEFFMAN taking place from October 2020 through February 28, 2021, TEJADA and KLEFFMAN coordinate the sale of large quantities of controlled substances, discuss prices, and arrange for the delivery at specified locations.

90.     During a conversation between TEJADA and KLEFFMAN on December 19, 2020, KLEFFMAN states "I don't go nowhere without my 9 mm anymore", meaning that KLEFFMAN always carries a firearm. TEJADA responds, "Good keep that mf blick by yo side always" "That's how I am when I'm out here." I believe in this conversation, TEJADA agrees that KLEFFMAN should keep a firearm on her ("keep that mf blick"), and that TEJADA carries a firearm when he is distributing controlled substances in Maine ("that's how I am when I'm out here"). Shortly thereafter, KLEFFMAN sends a message telling TEJADA, "you are the best plug I've ever had". I know plug to be a term for source of supply for controlled substances.

91.     On December 26, 2020, TEJADA and KLEFFMAN discuss "Chino" arriving with vacuum sealed bags. I know from this investigation that "Chino" is a nickname for COLEMAN. TEJADA then states what he has provided KLEFFMAN: "235 and 150 soft and 70 of ice". I believe this text message refers to 235 grams of fentanyl, 150 grams of cocaine powder ("soft"), and 70 grams of methamphetamine ("ice"). TEJADA then transmits a price for the drugs: "235 comes out to 115k 150 comes to 10k then the 70 I'm only gonna charge u 1k". In this exchange TEJADA indicates that the price for the 235 grams of fentanyl is $115,000 ("115k"), the 150 grams of cocaine powder is $10,000 ("10k"), and the 70 grams of methamphetamine is $1,000 ("1k"). TEJADA then states,

"Then the other 200 14k" and "And you can keep the 35 grams for freee" "140k". In this text message, TEJADA tallies the amount owed to be $140,000.

92.    On February 28, 2021, TEJADA and KLEFFMAN arrange for KLEFFMAN to meet TEJADA. During the conversation, KLEFFMAN and TEJADA discuss AirBnB that TEJADA and KLEFFMAN have obtained. During the conversation, KLEFFMAN indicates she wants to deliver $7,000 cash to TEJADA ("seven gees", My bad I wanted to give you some of this bread too I got seven grand to give you"). KLEFFMAN also indicates that she has obtained a handheld vacuum sealer and bags for the sealer so that TEJADA can do the sealing anywhere ("Oh I got u one of those hand held vacuum dealers" "Sealers" "And bags for it" "That way u can do it anywhere"). They coordinate the meet via text message, and the messages reveal that they ultimately conduct the exchange at approximately 18:00 on February 28, 2021.

93.    On the TEJADA PHONE investigators also found images of what appear to be large quantities of controlled substances, including cocaine base and fentanyl. For example, on or about February 17, 2021, TEJADA received a photo that depicts a purple controlled substance in a vacuum-sealed package on a scale that indicates the weight is 505.6 grams. TEJADA received this photograph from a contact using a phone number ending in 9438 that is believed to be used by his father, Miguel MINIER. Based on its appearance and surrounding text messages with MINIER on the 9438 phone, I believe that the controlled substance depicted is in fact 505 grams of purple fentanyl. The still image of the purple fentanyl recovered from the TEJADA PHONE follows:



94.     On February 19, 2021, the TEJADA PHONE sent this same photo of the 505 grams purple

fentanyl received from MINIER to KLEFFMAN. During the conversation TEJADA tells

KLEFFMAN, "Jus got this in my hand too", meaning that he just got this amount of purple fentanyl

in his possession. KLEFFMAN replies "Damn don't that look beautiful" "I swear to God I just

got a rush just looking at that picture." KLEFFMAN and TEJADA discuss the distribution of

multi-kilogram quantities of controlled substances and exchange of cash in the tens of thousands.

KLEFFMAN and TEJADA also discuss AirBnb rentals that TEJADA is obtaining and the logistics

of obtaining accounts to obtain the rentals.

95.     In other conversations with other individuals using a 207 Maine area-code located on the

TEJADA PHONE, TEJADA arranges to sell the approximate purple fentanyl (including the

specific 505 grams depicted in the photograph) and indicates to other drug contacts that he is in

possession of purple fentanyl, referring to it as "purple" and "purple fet", which I know to mean fentanyl.[12]

### C. TEXT MESSAGES IDENTIFYING TARGET LOCATION 2

96.     In numerous conversations with KLEFFMAN located in the TEJADA PHONE, KLEFFMAN directs TEJADA to her home, describes having money owed to TEJADA located at her home, or directs TEJADA to meet her in Trenton.

97.     On October 10, 2020, TEJADA delivered "250" of a controlled substance to KLEFFMAN and directed KLEFFMAN to check-in on another drug customer named "Jackie".  KLEFFMAN responds that she will "stop thru to her [(Jackie's)] house on [her] way home" after receiving the controlled substances, suggesting that she headed home with the controlled substances.

98.     On October 18, 2020, KLEFFMAN texted TEJADA to meet her at 799 Oak Point Road, Trenton, Maine, stating via text "And no matter what if you hear from me or not just come to this address 799 Oak Point Rd., Trenton Maine."  I know from Google Maps that 799 Oak Point Road is the intersection where Birch Heights Drive begins and is in close proximity to TARGET LOCATION 2.  There are no other houses located at this address besides TARGET LOCATION 2.

99.     Another example took place on December 17, 2020, where KLEFFMAN directs TEJADA to her "home" to retrieve "bread" meaning money that KLEFFMAN owed TEJADA.

---

[12] I know TEJADA to have discussed purple fentanyl with other drug contacts.  For example, on December 24, 2020, TEJADA sent a text message to a contact asking "So how much u got of the non purple fet ik u got 285 of the purple but the other one."  In this text message, TEJADA is asking how much of the non-purple fentanyl the contact has, and notes that he knows ("ik") that the contact has 285 grams of the purple fentanyl.  On February 11, 2021, TEJADA sent a text message stating, "My people trynna toss me whole brick of the purple and like 500 of soft."  In this text message, TEJADA is informing a contact that he will soon be in possession of a kilogram of purple fentanyl, and 500 grams of cocaine powder.  From these and dozens of other text messages, it is clear that TEJADA is discussing kilogram quantities of fentanyl.

100.    On February 4, 2021, TEJADA texted MINIER on the 9438 Phone directing MINIER to retrieve money. TEJADA texts MINIER "Pork now she not answering I think she sleepi" "Sleeping u gotta go to her house". TEJADA then texts MINIER the address of "799 oak point rd Trenton" and further describes the location as, "It's a little street called birch height" "Trenton". TEJADA additionally describes the location as "The only house in that driveway". From this text message, it is clear that KLEFFMAN conducts business and exchanges of drugs or cash at TARGET LOCATION 2.

## INFORMATION FROM MAINE DEA

101.    FBI has been coordinating this investigation with investigators from Maine Drug Enforcement Agency ("MDEA"), including MDEA Special Agent Nickolas Huggins. I learned the following from SA HUGGINS:

a.    Maine DEA identified one of OTH's recent Maine connections to be Garrett COLLINS. COLLINS lives in Orland, ME and in November of 2020, provided information to MDEA indicating that he (COLLINS) had in the recent past transported large amounts of methamphetamine for OTH to the Northern towns of Maine.

b.    Maine DEA was aware that TRG members and their associates have rented and/or stayed at various Airbnb's in Bangor. Maine DEA confirmed with one Airbnb host, TEJADA personally rented 250 Randolph Drive in Bangor, Maine for three adults from December 13th, 2020 to December 19th, 2020. During TEJADA's stay, Maine DEA conducted surveillance of the property. Maine DEA observed a Red Hyundai Santa-Fe (New Jersey E12-MJW) frequent the property. State DMV showed the vehicle was an Enterprise rental, actively rented by LUCY ROSARIO DE TEJADA. At the time, ROSARIO rented the vehicle from December 8th until December 18th.

c.    On December 17th, Maine DEA was advised by myself (S/A Craig Harvey) that GPS pings were both active on COLEMAN and TEJADA's cellphones and that they were both were actively pinging in Bangor at that time.

d.    On December 17th, at approximately 1630, while conducting surveillance on Randolph Drive, Maine DEA observed a female exit the property of 250 Randolph, enter the New Jersey rental and drive to 310 Grove Street in Bangor. Maine DEA confirmed 310 Grove Street was another Airbnb actively rented by Christina

BERNBAUM. Maine DEA confirmed with the host, BERNBAUM had rented the Grove Street property from December 10th until January 7th, 2021. In speaking with the host, she confirmed BERNBAUM was a long-term renter and had rented the same property (310 Grove) from November 6th until December 4th.

e. 

f. 

g. Approximately 45 minutes later, at approximately 19:00, a Black Ford Fusion (Mass: 9YL219) arrived at the Air BNB. Two males exited the vehicle. Photographs of these two males were identified by FBI to Armani TEJADA and Juan HERRERA. Approximately 20 minutes after TEJADA and HERRERA arrived, all five individuals exit the property, switched vehicles and left the location. HERRERA and TEJADA left in the Blue Jeep Gladiator, MINIER, ROSARIO and the young child leave the residence in the Black Fusion.

h. 

i. Maine DEA confirmed with Hertz, the Blue Jeep Gladiator was rented by ROSARIO in Massachusetts on March 16th until the 22nd. Maine DEA also confirmed with DMV that the Black Ford was owned and registered personally by ROSARIO.

j. Maine DEA intelligence reports have also identified TEJADA as a Maine drug connection to Shelby Kleffman, a known drug user/trafficker in Maine. In the TEJADA PHONE, investigators located an extensive conversation with a contact named "Shelby" with a 207 area-code and number ending in 6546, and a second number with a 207 area-code and number ending in 6399.

k. The afternoon of March 18, 2021, a vehicle owned and believed to be operated by KLEFFMAN was captured on a license plate reader ("LPR") inbound to Bangor, Maine at 17:30, approximately one hour before TEJADA and HERRERA arrived. This vehicle is a Silver 2011 Toyota Corolla, Maine registration 1180Y, with VIN:

2T1BU4EEXB3713702, registered to KLEFFMAN with a 4 Birch Heights Drive, Trenton, Maine address. This placement of the LPR is consistent with capturing KLEFFMAN travelling inbound to TARGET LOCATION 1 from TARGET LOCATION 2.

l.   On March 19, 2021, at 01:54, KLEFFMAN's Toyota Corolla was captured on an LPR heading out of Bangor, Maine, consistent with travel to TARGET LOCATION 2.

m.   On the evening of March 20, 2021 at about 23:22, KLEFFMAN's Toyota Corolla was captured on the LPR again inbound to Bangor from a direction consistent with travelling from TARGET LOCATION 2.

n.   

o.   KLEFFMAN's Toyota Corolla was then captured on a license reader headed east from Bangor, Maine at 00:03 (UTC -4) on March 21, 2021, consistent with her heading from TARGET LOCATION 1 to TARGET LOCATION 2.

p.   Agent Nickolas Huggins from the Maine State DEA is familiar with LADD. On 3/21/2021, S/A Huggins learned that a confidential source ("CS") had told Detective Sergeant Patricia McLaughlin of the East Millinocket Police Department that within the last couple days (since 3/18/2021), LADD recently came into possession of crack cocaine that he is selling. The CS also provided information to Sgt. McLaughlin that LADD was due to receive an additional delivery of cocaine in a few days, which would be 3/22/21 or 3/23/21. I believe the timing of LADD being in possession of crack cocaine to be indicative of LADD receiving controlled substances from the TRG drug trafficking organization, and that the delivery of crack cocaine to LADD coincides with TEJADA and HERRERA's trips from the AirBnB.

q.   SA HUGGINS also provided information from a police report dated January 13, 2021, wherein two drug users were stopped by Deputy Dupuis of the Hancock County Sheriff Department on January 12, 2021. After locating drug paraphernalia in the vehicle, including a crack pipe and a small amount of fentanyl, the Deputy provided the individuals with their Miranda rights, the two individuals agreed to speak with the Deputy who made the stop. One of the individuals, who I will refer to as CS-3 provided the following information. CS-3 identified KLEFFMAN as the person from whom CS-3 purchases fentanyl and that KLEFFMAN charges $100 per gram. CS-3 stated that KLEFFMAN also sells methamphetamine ("ice").

CS-3 stated that in order to purchase from KLEFFMAN, he would meet her at a location in Trenton, Maine, off "Oak Point Road", which I know to be consistent with the address of TARGET LOCATION 2. CS-3 indicates that KLEFFMAN sometimes employs a metal detector to ensure no one who enters the residence is wearing a wire. CS-3 indicated that he walks in and gives KLEFFMAN the money in the kitchen area, and then KLEFFMAN goes to a bedroom to "weigh up" the controlled substances while CS-3 waits in the living room. CS-3 stated he had bought fentanyl from KLEFFMAN earlier that day (on January 12, 2021), and that KLEFFMAN would usually have more than grams in the location ("she might have a finger at a time or a couple"). CS-3 stated that KLEFFMAN has a lot of traffic in the residence and tries to limit the amount of people there at a single time. CS-3 stated that he goes to the Oak Point Road location a couple times per week to buy fentanyl.

102. On 03/22/2021 at approximately 8:50, ATF S/A Kelter conducted surveillance at the residence of Lucy ROSARIO located at 3 North Common Terrance in Lynn, MA. While at this residence, S/A Kelter observed the black 2014 Ford Fusion, bearing MA plate 9YL219 parked at this residence. The vehicle was parked and unoccupied during the time it was observed.

103. On 03/22/2021 at approximately 12:00, S/A Kelter conducted surveillance in condominium complex located at 4 First St, Salem, MA, which is the last known residence for Armani MINIER-TEJEDA, and the location where a search warrant was executed on March 4, 2021. While in this area, S/A Kelter observed a blue 2020 Jeep Gladiator bearing MA plate 9GV713 parking in front of building 9 at this complex. This vehicle was parked and unoccupied during the time it was observed.

104. On 3/22/2021 at approximately 21:15 the black 2014 Ford Fusion, bearing MA plate 9YL219 arrived at TARGET LOCATION 1. MINIER was observed exiting the vehicle holding a black bag and entering the location. ROSARIO and a child also entered as well.

105. On 3/22/2021 at approximately 22:00, KLEFFMAN's Toyota Corolla was captured on LPR heading into Bangor, Maine.

106.     On 3/22/2021 at approximately 22:10, SA IRELAND was informed by MICHAELS that KLEFFMAN was observed entering TARGET LOCATION 1. MICHAELS reported that KLEFFMAN was at TARGET LOCATION 1 for approximately 5 minutes and as she left it appeared that KLEFFMAN was concealing something under her jacket.

107.     On 3/22/2021 at approximately 22:19, later KLEFFMAN's Toyota Corolla was captured on LPR heading out of Bangor, Maine toward TARGET LOCATION 2.

108.     On 3/22/2021 at approximately 22:20, MDEA agents commenced surveillance of KLEFFMAN's Toyota Corolla leaving Bangor, Maine heading towards TARGET LOCATION 2. MDEA agents maintained surveillance of KLEFFMAN's Toyota Corolla and observed KLEFFMAN arrive at TARGET LOCATION 2 at approximately 23:10.

109.     Based on the above, I believe that TEJADA, HERRERA and MINIER are employing TARGET LOCATION 1 consistent with the past pattern of AirBnB rentals that were utilized to distribute controlled substances, store firearms and controlled substances, and a location to collect payment. I further believe based on this investigation and my knowledge of the drug operation that TEJADA, HERRERA and/or MINIER have stored controlled substances at TARGET LOCATION 1, and will continue to employ TARGET LOCATION 1 during the term of the rental (before March 31, 2021), to bring up additional controlled substances and to collect payment from the drug contacts.   Based on the surveillance on 3/22/2021, I believe KLEFFMAN retrieved controlled substances and brought it back to TARGET LOCATION 2.

110.     On the morning of 3/23/2021, investigators learned that the Jeep Gladiator was returned and that LUCY ROSARIO had rented a black Ford Edge, bearing Florida Reg. KCKV12 for a period of March 22, 2021 through April 1, 2021.   On the morning of 3/23/2021, SA Kelter

observed a black Ford Edge in the vicinity of 4 First Street, Salem, Massachusetts, which is

TEJADA and HERRERA's last known residence.

### BASIS TO BELIEVE EVIDENCE SOUGHT FOR BY WARRANT WILL BE LOCATED AT TARGET LOCATION

111.    Based on my training and experience in narcotics investigations, I have learned about the

practices of those involved in the trafficking of controlled substances, including:

a.    Drug traffickers frequently maintain books, records, receipts, notes, ledgers, money orders, emails, and other documents relating to the ordering, sale, and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances.  Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business;

b.    It is common for drug dealers to conceal records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

c.    Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s).  They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

d.    Drug traffickers commonly have photographs of themselves, their associates, their

property, and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

e. Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

f. Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above.

112. Based upon my training and experience, as well as the training and experience of other law enforcement officers I have worked with, I am aware of the following practices of those engaged in firearms offenses:

a. It is generally a common practice for illegal firearms traffickers to maintain records relating to their illegal firearms trafficking activities in their residences. Because firearms traffickers will need to have a source of supply, if they themselves are not able to lawfully purchase firearms, they tend to maintain and store records of sources of supply, amounts paid to sources of supply and other records relating to their customer base and information concerning the transactions. Such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain what is owed and to whom, in terms of money, firearms, and ammunition. Often illegal firearms traffickers keep ledgers or "pay and owe" records to show balances due for firearms sold in the past ("pay") and for payments expected ("owe") as to the illegal firearms trafficker's customers.

b. Additionally, illegal firearms traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their illegal firearms trafficking business. Such records can be kept physically on paper, or digitally on cellular phones. I am also aware that illegal firearms traffickers often maintain such documents related to their illegal firearms trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of firearms on the premises.

c. Even when illegal firearms dealers store their firearms outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for illegal firearms traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from illegal firearms sales or monies to be used to purchase firearms.

d. Many experienced illegal firearms traffickers will often engage in money laundering to conceal the source of their criminal proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, illegal firearms traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with illegal firearms trafficking would also typically be maintained in residences. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that illegal firearms traffickers generally try to hide cash and sensitive documents related to their illegal firearms trafficking in safes or other containers so that other individuals who are at their residence do not discover these materials.

e. During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal firearms is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

f. Based on training and experience, I know that most illegal firearms dealers regularly use cellular telephones to communicate about their illegal firearms trafficking activities with customers, suppliers, and other coconspirators, and to also ascertain firearms and ammunition availability and prices from websites. In my training and experience, I also am aware that illegal firearms traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, and are central to the negotiation and coordination of firearms dealing, illegal firearms dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many illegal firearms dealers do not dispose of their cellular telephones when getting a

new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by illegal firearms dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from illegal firearms dealers' residences.

113. Based on my training and experience, I know that individuals typically possess in their residences items that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

## CELLULAR PHONES AND DIGITAL DEVICES

114. As a general matter, from my training, experience, and information provided to me by other agents, I am aware that TRG members carry out, communicate about, and store records regarding their daily activities on cellular phones. These tasks are frequently accomplished through sending and receiving e-mail, text messages, and other forms of internet based messages; scheduling activities; arranging travel; purchasing items; searching for information on the internet; accessing personal accounts including banking information and social media accounts; and creating and storing images and videos of the TRG enterprise's membership, movements and activities.

115. Based upon my training and experience and evidence developed through this investigation, I know that the targets and TRG members under investigation routinely use the internet and cellular phones to communicate and coordinate the TRG's operations and its firearm trafficking, narcotics trafficking, and/or racketeering activity, and popularize and promote TRG and the various celebrations held by TRG. As such, the digital footprint of the targets and TRG is extensive and growing, and, therefore, it is reasonable to believe that digital devices owned by the targets and

members of TRG will contain evidence of firearm trafficking, narcotics trafficking, and/or racketeering activity by the target and TRG enterprise. As such, there is probable cause to believe that any cellular phones located in the TARGET LOCATIONS will constitute instrumentalities of the TARGET OFFENSES and will contain evidence of the TARGET OFFENSES committed by members of TRG and KLEFFMAN and LADD.

116. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who engage in the TARGET OFFENSES typically use cellular telephones to communicate with each other, the suppliers of controlled substances and firearms, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who illegally possess and use firearms and narcotics, and commit acts of violence, regularly keep records of their illegal activities and the coordination of their illegal activity. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific descriptions of firearms, controlled substances and ammunition to be obtained for specific customers, and communications between persons coordinating the possession of weapons, ammunition and commission of violent acts with the weapons.

117. Individuals engaged in illegal firearms activities often take photographs of the firearms and transmit those photographs to their coconspirators' rivals, customers, and the general public in order to expand their notoriety and reputation. Records of firearms and narcotics trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. In this case, the enterprise and racketeering conspiracy also will have generated extensive digital presence on cellular phones used by TEJADA, MINIER, HERRERA

that are believed to be located in the TARGET LOCATIONS. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on cellular telephones.

118.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers and cellular phones to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

119.    Additionally, I know that members of racketeering conspiracies and dealers in controlled substances often use cellular telephones in order to communicate quickly and economically with their coconspirators, suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones and computers to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to dealing in controlled substances and illegal firearms trafficking, including amounts, prices, makes, models, prices, caliber and other related information; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where conspirators met, and acts were taken in furtherance of the TARGET OFFENSES.

120.    Based on my training, experience, and information provided to me by other law enforcement officers, I am aware that individuals frequently use computers to create and store

records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

121.    Based on my training, experience, and information provided by other law enforcement officers and agents, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

122.    I am also aware that drug and firearms traffickers often utilize Facebook, Instagram, WhatsApp, Snapchat and text messaging to communicate with buyers and sellers and often post photos of themselves in possession of firearms, controlled substances and proceeds.

123.    Based on my knowledge, training, experience, and information provided to me by other law enforcement officers and agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer;

   b.    Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

   c.    Wholly apart from user-generated files, computer storage media in particular,

computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task;

d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently-viewed Internet pages or if a user takes steps to delete them.

124.    Based on my knowledge and training and the experience of other law enforcement officers and agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

a.    The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store is the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.    Technical requirements in analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from

external sources and destructive code imbedded in the system as a "booby trap."

125.    Based on the facts set forth above, I submit that there is probable cause to believe that the types of items listed above, and set forth in Attachment B attached hereto, items which constitute evidence of the commission of criminal offenses, as well as items otherwise criminally possessed, will be located at the TARGET LOCATIONS.

126.    The TARGET LOCATIONS may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the TARGET LOCATIONS during the execution of this warrant.  If the items described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## CONCLUSION

127.    Based on the information described above, there is probable cause to believe that that TEJADA, HERRERA, MINIER, BERNBAUM, KLEFFMAN, LADD other identified and unidentified coconspirators, and numerous other identified and unidentified members and associates have committed and continue to commit the above offenses and do so through the use of AirBnb rentals in the area of Bangor, Maine, and specifically TARGET LOCATION 1. Currently, TEJADA, HERRERA, and MINIER have been identified to be employing the AirBNB located at 20 Sixth Street, Bangor, Maine and to be continuing to operate in a similar pattern to the instances in which large quantities were transported to Maine and the AirBnB location was used

as a base of operation for the distribution of the controlled substances, and stash of firearms and currency.

128.     Based on the foregoing, there is probable cause to believe that KLEFFMAN continues to operate a large drug trafficking organization and that TARGET LOCATION 2 is a premises used by KLEFFMAN to store and transact in controlled substances and proceeds derived from drug trafficking.  TARGET LOCATION 2 is believed to be KLEFFMAN's residence and a location where the proceeds and instrumentalities of the TARGET OFFENSES are likely to be stored, such as currency and cellular phones used in furtherance of the TARGET OFFENSES.   As such, there is probable cause to believe that TARGET LOCATION 2 will contain evidence of the TARGET OFFENSES, more specifically described in Attachment B.

129.     Based on the information described above, there is also probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the TARGET LOCATIONS, and on the persons within the TARGET LOCATIONS.

130.   I request that the Court order that all papers in support of the applications, including the affidavit, and the search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on March 23, 2021,

Craig R. Harvey
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:  Mar 23 2021

City and state:  Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge

Printed name and title

# ATTACHMENT A-1
## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched is located at 20 Sixth Street, Bangor, Maine (hereinafter "TARGET LOCATION 1"). The building at 20 Sixth Street, Bangor, Maine is a red house with a door facing Sixth Street and a window to the right of the door. A photograph of 20 Sixth Street, Bangor, Maine follows:



The search of TARGET LOCATION 1 shall include the entire curtilage, any vehicles and campers located on the curtilage and property, any outbuildings, trailers, garages, common areas, all rooms, crawl spaces, safes, briefcases, storage areas, containers, and all containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans located on the premises, and the person of any occupants.

**ATTACHMENT A-2**
**DESCRIPTION OF THE PREMISES TO BE SEARCHED**

The premises to be searched is located at 4 Birch Heights Drive, Trenton, Maine (hereinafter "TARGET LOCATION 2"). The building at 4 Birch Heights, Trenton, Maine is 4 Birch Heights Drive, Trenton, Maine is a white single story structure with a porch facing the street. A photograph of 4 Birch Heights Drive, Trenton, Maine follows:



The search of TARGET LOCATION 2 shall include the entire curtilage, any vehicles and campers located on the curtilage and property, any outbuildings, trailers, garages, common areas, all rooms, crawl spaces, safes, briefcases, storage areas, containers, and all containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans located on the premises, and the person of any occupants.

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

I.    All records, in whatever form, equipment, and tangible objects that constitute or contain evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922 and 924 (relating to firearms offenses), 18 U.S.C. §§ 1959 and 1962 (relating to racketeering activity and violent crimes in aid of racketeering), and 21 U.S.C. §§ 841 and 846 (relating to drug offenses and conspiracy), including:

    A.    Records and tangible objects pertaining to the following topics:

        1.    The existence, operations, and structure of the criminal organization known as the "Tiny Rascals Gang" ("TRG");

        2.    The identities and aliases of leaders, members, associates, co-conspirators, rivals, customers, or victims of TRG;

        3.    The locations or travels of any leaders, members, associates, co-conspirators, rivals, customers, or victims of TRG;

        4.    The methods of communications between members, associates, co-conspirators, rivals, or victims of TRG, including the telephone numbers, messaging applications, and social media accounts used by leaders, members, associates, co-conspirators, rivals, or victims of TRG;

        5.    Communications between members, associates, co-conspirators, rivals, or victims of TRG including discussion regarding any criminal activities by or on behalf of members of TRG, racketeering activity by any leaders, members, associates, co-conspirators, rivals, or victims of TRG;

        6.    Acts taken or statements made by leaders, members, associates, and co-conspirators of TRG during or in furtherance of the conspiracy;

        7.    manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys;

8.     the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephones, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents;

9.     methods of communications between co-conspirators, rivals, or victims including the telephone numbers, messaging applications, and social media accounts used;

10.     communications between co-conspirators regarding manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, firearms, ammunition, and any documents and items related to firearms and ammunition, including manuals, storage containers, receipts, invoices, literature, targets, shell casings, firearms accessories, magazines, scopes, silencers, and other items made for or anticipated to be used in conjunction with firearms;

11.     acts taken or statements made by co-conspirators during or in furtherance of the conspiracy;

12.     photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances; and

13.     laundering of proceeds of controlled substances, through conversion of funds into expensive luxury items such as jewelry and designer goods, the concealment of the true source of funds, and false statements concerning legitimate sources of income, including the presence (or absence of paystubs substantiating income), receipts and records of items purchased, the manner and means by which items and necessities are paid for, transactions in cash and other monetary instruments, credit cards, debit cards, money orders, and other instruments by which cash proceeds can be transacted and converted into good and services;

B.     Any controlled substances, including fentanyl, heroin, marijuana, cocaine, and cocaine base;

C.     Items indicative of or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, watches, jewelry, chains, bracelets, diamonds,

money counters, and documents evidencing the handling of or disposal of bulk currency, procuring or leasing of these items and other high-value items.

D. Firearms, ammunition, and any documents and items related to firearms and ammunition, including manuals, storage containers, receipts, invoices, literature, targets, shell casings, firearms accessories, selector switches, magazines, scopes, silencers, and other items made for or anticipated to be used in conjunction with firearms;

E. Items, materials, equipment and paraphernalia associated with the manufacturing, ordering, packaging, importation, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, storage bins, glass containers, cutting agents, and scales;

F. Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers);

G. The cellular phone associated with phone number 781-990-9438;

H. The cellular phone associated with phone number 207-605-6399;

I. The cellular phone associated with phone number 207-659-6546;

J. The cellular phone associated with phone number 207-569-5342;

K. For any hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):

    1. evidence of who used, owned, or controlled the computer equipment;

    2. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

    3. evidence of the attachment of other computer hardware or storage media;

    4. evidence of counter-forensic programs and associated data that are designed to eliminate data;

    5. evidence of when the computer equipment was used;

    6. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment; and

7. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage.

II. All hardware, equipment, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in Section I.

## DEFINITIONS

For the purpose of this warrant:

a. "Equipment" means any hardware, computer software, mobile phone, storage media, and data.

b. "Hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

c. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

d. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

e. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

f. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or

instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes